UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.

YIHOU HAN,

        Defendant.
_____/

Case: 2:21−cr−20256
Assigned To : Parker, Linda V.
Referral Judge: Grand, David R.
Assign. Date : 4/15/2021
Description: INFO USA V. HAN (NA)

VIOLATION: 18 U.S.C. § 1349

## INFORMATION

THE ACTING ASSISTANT ATTORNEY GENERAL CHARGES:

### GENERAL ALLEGATIONS

At all times relevant to this Information:

### Relevant Entities

1.     Holding Company A was a unitary thrift holding company based in the Eastern District of Michigan. Holding Company A was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934. In or around the fall of 2017, Holding Company A completed an initial public offering, and the company's stock began trading publicly on the Nasdaq Stock Market, a national securities exchange.

2.     Financial Institution A was a federally insured depository institution

established in or around 1984 that offered a broad range of loan products to the residential and commercial markets. Financial Institution A was a wholly owned subsidiary of Holding Company A (hereinafter, Holding Company A and Financial Institution A are collectively referred to as the "Bank"). Financial Institution A's headquarters and operational center were located in Southfield, Michigan, in the Eastern District of Michigan, with branches located in San Francisco, California; Los Angeles, California; Seattle, Washington; and New York, New York.

3. Most of Financial Institution A's senior management and operational functions were located in Southfield, Michigan. These operational functions and personnel included the majority of employees in the Underwriting Department and the Quality-Control Department. Financial Institution A's Underwriting Department received and reviewed loan applications submitted by the Bank's loan officers, including for residential loans, and determined whether the Bank should originate the loans. The Quality-Control Department audited loans and loan applications both before and after they were fully funded, to ensure they were in full compliance with the Financial Institution A's underwriting guidelines and policies.

4. Financial Institution A also employed loan officers who worked at the various branches and were responsible for originating residential loans. Financial Institution A used a commission-based compensation structure for loan officers that was based on the total dollar volume of the residential loans originated by the officer.

Generally, the more loans that the loan officer originated, the more personal income the loan officer earned, and the more revenue that Financial Institution A generated through fees and interest associated with the loans.

### The Defendant and Relevant Individuals

5.  **YIHOU HAN** (hereinafter, the "defendant") worked at Financial Institution A from in or around 2009 through in or around 2019. The defendant worked as a bank teller from 2009 through in or around 2011. The defendant served as a loan officer from in or around 2011 through in or around 2016, when she was promoted to Senior Loan Officer. In or around 2017, the defendant was promoted to Vice President and in or around 2018 was promoted again to Managing Director for Residential Lending, a position in which she oversaw the Bank's New York residential-lending operations. From in or around 2011 through in or around 2019, the defendant originated residential loans in various locations, including San Francisco, New York, and Los Angeles. The defendant also provided informal training, mentoring, and oversight to loan officers and staff throughout Financial Institution A's operations, and helped train and mentor more than 30 loan officers and loan assistants. At all times relevant to this Information, the defendant acted within the scope of her agency and employment at Financial Institution A and Holding Company A, and with the intent, at least in part, to benefit Financial Institution A, Holding Company A, and the Bank's senior management, including

Executive 1, Executive 2, Executive 3, and Executive 4.

6. Executive 1 was the founder and majority shareholder of Financial Institution A and provided oversight over the management of Financial Institution A, including its residential-lending programs.

7. Executive 2 served as Chief Operating Officer and Chief Financial Officer of Financial Institution A and provided oversight over the management of Financial Institution A, including its residential-lending programs.

8. Executive 3 served as President of Commercial and Retail Banking and the Chief Lending Officer of Financial Institution A, and provided oversight over Financial Institution A's lending operations throughout the United States.

9. Executive 4 served as the Senior Vice President and Regional Director of Financial Institution A and provided oversight over Financial Institution A's residential-lending operations throughout California, including in Los Angeles and San Francisco.

**Financial Institution A's Residential Lending Operations**

10. It was the practice of Financial Institution A to make loans secured by real property to borrowers. Such loans were often called mortgages or mortgage loans. In determining whether or not to extend any such loan, it was also the practice of Financial Institution A's Underwriting Department to rely upon the information contained in the borrower's mortgage-related documents, such as the Uniform

4

Residential Loan Application (or a "Form 1003") and supporting documentation provided by the borrower.

11. Form 1003, which was designed to be completed by the applicant borrower with the lender's assistance, required that the borrower truthfully provide to the lender various information, including employment information, monthly income, and detailed financial information. Form 1003 also required the borrower to provide specifics of the residential-property transaction, such as the purchase price and whether the borrower would use the property as a primary residence, secondary residence, or investment.

12. Near the end of Form 1003, the form required an attestation indicating that the borrower agreed and acknowledged to the lender that the information provided in the application: (a) was true and correct and that any intentional or negligent misrepresentation of the information contained in the application may result in civil or criminal liability; and (b) would be supplemented in the event material facts changed prior to the closing of the loan.

### Financial Institution A's Advantage Loan Program

a. *Overview of the Advantage Loan Program*

13. The origination of mortgage loans comprised the largest portion of Financial Institution A's loan portfolio. In or around 2011, Financial Institution A created a residential loan program known as the Advantage Loan Program, which

5

consisted of one, three, five, or seven-year adjustable rate mortgages. The Advantage Loan Program was designed for members of the Asian community, with the primary markets being San Francisco, Los Angeles, New York, and Seattle. The program touted its "flexible" documentation requirements and fast underwriting and closing capabilities. The program required a minimum 35% down-payment and charged higher rates and fees than were available elsewhere in the market, but it did not require submission of typical documentation, such as an applicant's tax returns or payroll records.

14. Employees and agents of Financial Institution A originated at least $5 billion in loans through the Advantage Loan Program between in or around 2011 and in or around 2019, including at least 1,288 Advantage Loan Program mortgage loans originated by the defendant, representing approximately $683,535,305 in credit extended by Financial Institution A.

15. The defendant worked closely with and at the direction of Executive 1, Executive 2, Executive 3, Executive 4, and others to develop, expand, and manage the Advantage Loan Program, including by, among other things, hiring, training, and mentoring loan officers and loan assistants, expanding the Bank's presence into new geographic markets, and participating in meetings with regulators and potential investors during which the Advantage Loan Program was discussed. Additionally, in or around 2018, the defendant began attending monthly executive sales meetings

with Executive 1, Executive 2, Executive 3, and Executive 4, during which the Advantage Loan Program's performance was discussed.

      b. *Financial Institution A's Underwriting Guidelines and Representations Regarding Underwriting for the Advantage Loan Program*

16. Financial Institution A's Underwriting Department maintained internal underwriting guidelines (the "Underwriting Guidelines") that governed the loan approval process for the Advantage Loan Program. Underwriting Guidelines required loan officers to obtain various documents from the borrower and the borrower's employer. According to the Underwriting Guidelines, the loan officer would often be required to obtain, among other records, documentation supporting the borrower's employment and income including, for instance, a verification of employment ("VOE") letter from the borrower's employer. Generally, the VOE provided the borrower's title, salary, and start date of employment. In some instances, the Underwriting Guidelines allowed the borrower to provide bank statements to demonstrate a pattern of income for the borrower in lieu of independent confirmation of income, such as pay stubs or a W-2.

17. In addition, as part of the application process for the Advantage Loan Program, if borrowers received funds to help with their down payments, the Underwriting Guidelines required the loan officers to obtain mortgage gift letters, which would memorialize the amount of the "gift," the nature of the relationship between the borrower and the donor, and that the borrower was under no obligation

to return the money provided for the down payment on the residence. Under these Underwriting Guidelines, only family members of the borrower were permitted to provide "gift" funds for a borrower's down payment.

18. Similarly, in some instances, Financial Institution A's Underwriting Department required loan officers to obtain "letters of explanation" from a borrower to address anomalous aspects of a borrower's loan application, or certain portions of the application that appeared to be inconsistent with the Underwriting Guidelines. For example, a "letter of explanation" from the borrower might be required to document that the borrower was currently living with a family member rent-free, or that negative information in the borrower's credit report had been appropriately addressed.

19. In addition to collecting these documents, loan officers were supposed to calculate the borrower's debt-to-income ratio. The debt-to-income ratio was a personal-finance measure that compared the amount of debt a borrower had to the borrower's overall income and was used to measure the borrower's ability to manage monthly mortgage payments. Taken together, the various documents obtained from the borrower and the borrower's employer, and related information, were critical to completing the Form 1003 and assessing the creditworthiness of a borrower's application.

20. In its public filings submitted to the SEC and disclosed to the investing

public between in or around 2017 and in or around 2019, Holding Company A made certain material representations regarding Financial Institution A's Advantage Loan Program, including its underwriting process.  For instance, in its SEC registration statement Form S-1/A, filed on or about November 7, 2017, Holding Company A claimed that the Bank's "board of directors and management team have created a risk-conscious culture that is focused on quality growth," and that the Bank had "a disciplined and conservative underwriting approach[.]"  In these filings, Holding Company A described the Bank's loan officers as the "first line of defense for assuring credit quality and the integrity of our risk rating process[,]" and claimed that the Bank's loan approval process required the Bank's loan officers to obtain information from borrowers, meet face-to-face with each borrower, and produce a narrative document recommending the loan.

## COUNT 1
**(Conspiracy to Commit Bank and Wire Fraud –18 U.S.C. § 1349)**

21.     Paragraphs 1 through 20 are reincorporated as if realleged herein.

22.     Beginning at least as early as in or around 2011, and continuing through at least in or around 2019, both dates being approximate and inclusive, in the Eastern District of Michigan, and elsewhere, the defendant, **YIHOU HAN**, together with others known and unknown, knowingly combined, conspired, and agreed to commit certain offenses against the United States, namely:

(a) bank fraud, in violation of 18 U.S.C. § 1344(2), to wit: to knowingly,

and with the intent to defraud, execute and attempt to execute a scheme and artifice to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, Financial Institution A, by means of materially false and fraudulent pretenses, representations, and promises; and

(b) wire fraud, in violation of 18 U.S.C. § 1343, to wit: to knowingly and with the intent to defraud, devise and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

## Purpose of the Conspiracy

23. It was the purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves and, in part, benefit the Bank by: (1) submitting false and fraudulent loan applications, and training other co-conspirator loan officers to submit false and fraudulent loan applications, for the Advantage Loan Program; (2) generating revenue for the Bank and earning money through

commissions based on the volume of false and fraudulent loans originated under the Advantage Loan Program; and (3) concealing the conspiracy.

## The Manner and Means of the Conspiracy

24. The manner and means by which the defendant and her co-conspirators sought to accomplish the objects of the conspiracy included, among others:

25. Members of the Bank's senior management encouraged the defendant and her co-conspirators to increase the volume of Advantage Loan Program loan originations in order to increase Financial Institution A's revenue.

26. With the knowledge and encouragement of members of Financial Institution A's senior management, including Executive 1, Executive 2, Executive 3, and Executive 4, the defendant and her co-conspirators falsified documents and material information about borrowers' qualifications for the Advantage Loan Program, and concealed material information about borrowers from Financial Institution A's Underwriting Department, in order to increase the volume of loans originated under the Advantage Loan Program – which, in turn, increased the Bank's revenue – and their personal commissions.

27. The defendant and her co-conspirators knowingly provided Advantage Loan Program loans to borrowers involved in money laundering and tax-evasion activity. These borrowers operated businesses that did not report their taxable income to U.S. taxing authorities, and instead concealed and disguised the source

11

and origin of their income. The defendant and her co-conspirators also provided loans to borrowers who hid their assets from the U.S. government in order to qualify for government-sponsored benefits.

28. In connection with loans provided to these and other borrowers, the defendant and her co-conspirators falsified and caused to be falsified: borrowers' income and debt-to-income ratios; information contained in Form 1003s, including borrowers' job titles, employment history, and whether the application was taken face-to-face; and supporting documents, including verification of employment letters, gift letters, face-to-face interview narratives, and letters of explanation. The defendant and her co-conspirators also directed borrowers to make structured deposits to appear consistent with the falsified income included in their loan applications.

29. The defendant and her co-conspirators concealed information from Financial Institution A's Underwriting Department and Quality-Control Department that the defendant believed would delay or prevent the Bank from originating loans under the Advantage Loan Program.

30. The defendant and her co-conspirators sent, and caused to be sent, the loan applications and supporting documents containing false and fraudulent information to Financial Institution A's Underwriting Department through use of interstate wire communications. The purpose and foreseeable consequence of

transmitting the falsified loan applications and supporting documents was to cause Financial Institution A's Underwriting Department to approve the fraudulent loans and disburse loan proceeds; to in turn cause Financial Institution A to pay the defendant and her co-conspirators commission fees; and to generate revenue for the Bank through increased loan originations.

31. The false and fraudulent information described above that the defendant and her co-conspirators included and caused to be included in Advantage Loan Program applications, was ultimately transmitted to, and relied upon by, Financial Institution A and its Underwriting Department and caused Financial Institution A to originate residential mortgage loans and extend credit to borrowers that otherwise would not have qualified for credit from Financial Institution A based upon the Underwriting Guidelines. The origination of the fraudulent loans directly increased the defendant and her co-conspirators' personal income through the generation of commissions and increased Financial Institution A's revenue through fees and interest associated with the origination of the fraudulent loans.

32. The defendant and her co-conspirators undermined Financial Institution A's ability to implement effective anti-money laundering controls to monitor, investigate, and report potentially suspicious activity involving Advantage Loan Program borrowers, in contravention of applicable anti-money laundering laws and regulations. For example, the defendant and her co-conspirators would and did

advise borrowers to transfer funds to third parties, who would then transfer the funds back to the borrowers by disguising such funds as "gifts." In doing so, the defendant and her co-conspirators caused borrowers to create a series of layered transactions designed to conceal and obscure the true source and origin of the funds used as down payments for the mortgages and to promote the underlying fraud scheme.

33. During the conspiracy period, the defendant originated at least 1,288 Advantage Loan Program mortgage loans, representing at least $683,535,305 in credit extended by Financial Institution A. Between in or around 2015 and in or around 2019, the overwhelming majority of the loans the defendant originated included one or more of the fraudulent actions described above, with the most common fabrication being the borrower's income, and the defendant earned approximately $3,381,355.26 in commissions, primarily as a result of the origination of these fraudulent loans.

(All in violation of Title 18, United States Code, Section 1349)

## FORFEITURE ALLEGATIONS
**(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461;
18 U.S.C. §§ 982(a)(2)—Criminal Forfeiture)**

34. The allegations contained in Count 1 of this Information are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture against the defendant **YIHOU HAN** pursuant to Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461.

35. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and 982(a)(2), together with Title 28, United States Code, Section 2461, upon being convicted of the crime charged in Count 1 of this Information, the convicted defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense.

36. <u>Money Judgment</u>: Property subject to forfeiture includes, but is not limited to, a forfeiture money judgment equal to at least $3,381,355.26 in United States currency, in the aggregate, or such amount as is proved in this matter, representing the total amount of proceeds and/or gross proceeds obtained as a result of the defendant's violations as alleged in Count 1 of the Information.

37. <u>Substitute Assets</u>: If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b) and/or Title

15

28, United States Code, Section 2461, to seek to forfeit any other property of the defendant, up to the value of such property.

DATED: April 15, 2021

                                               DANIEL S. KAHN
                                               Acting Chief, Fraud Section
                                               U.S. Department of Justice

                                               _____
                                               JASON COVERT
                                               KEVIN LOWELL
                                               Trial Attorneys

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | Case Number<br>21-cr-20256 |
|---|---|---|

**NOTE:** It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| **Companion Case Information** | **Companion Case Number:** |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | **Judge Assigned:** |
| ☐ Yes    ☒ No | **AUSA's Initials:** |

**Case Title:** USA v. YiHou Han

**County where offense occurred :** Oakland

**Check One:**   ☒ Felony    ☐ Misdemeanor    ☐ Petty

    ____Indictment/____Information --- **no** prior complaint.
    ____Indictment/ ✓ Information --- based upon prior complaint [**Case number:** 20-mj-30474 ]
    ____Indictment/____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

**Superseding Case Information**

**Superseding to Case No:** _____    **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| | | |

Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.

April 15, 2021
Date

/s/ Jason Covert, Trial Attorney

DOJ, Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC  20005
Fax:
E-Mail address: jason.covert@usdoj.gov
Attorney Bar #:
(202) 320-4366

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.