United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,

                                    Hon. Linda V. Parker

v.

                                    Case No. 21-CR-20256

YiHou Han,

        Defendant.

_____/

# Plea Agreement

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section ("the government") and the defendant YiHou Han, have reached a plea agreement under Rule 11 of the Federal Rules of Criminal Procedure. The plea agreement's terms are:

## 1. Count of Conviction

The defendant will waive her right to an indictment and will plead guilty to Count 1 of the Information. Count 1 charges the defendant with Conspiracy to Commit Bank Fraud and Wire Fraud in violation of 18 U.S.C. §1349.

**2.      Statutory Maximum Penalties**

The defendant understands that the count to which she is pleading guilty carries the following minimum and maximum statutory penalties:

| Count 1 | Term of imprisonment: | 30 years |
|---------|----------------------|----------|
|         | Fine: | $1,000,000 or twice the gross pecuniary gain or the gross pecuniary loss |
|         | Term of supervised release: | 5 years |

**3.      Agreement Not to Bring Additional Charges**

If the Court accepts this agreement and imposes sentence consistent with its terms, the government will not bring additional charges against the defendant for the conduct reflected in the factual basis of this Rule 11 Plea Agreement.

**4.      Elements of Count of Conviction**

The elements of Count 1 are:

(A)  First, that two or more persons conspired, or agreed, to commit the crimes of bank fraud or wire fraud; and

(B)  Second, that the defendant knowingly and voluntarily joined the conspiracy.

The elements of the objects of the conspiracy are:

Bank Fraud in violation of 18 U.S.C. § 1344(2)

(A) First, that the defendant knowingly executed a scheme to obtain any of the money, funds, or property owned by or under the control of a bank by means of false or fraudulent pretenses, representations or promises;

(B) Second, that the scheme included a material misrepresentation or concealment of a material fact;

(C) Third, that the defendant had the intent to deceive or cheat someone for the purpose of either causing a financial loss to another or bringing about a financial gain to herself or to another person; and

(D) Fourth, that the bank was federally insured.

Wire Fraud in violation of 18 U.S.C. § 1343

(A) First, that the defendant knowingly participated in a scheme to defraud in order to obtain money or property;

(B) Second, that the scheme included a material misrepresentation or concealment of a material fact;

(C) Third, that the defendant had the intent to defraud; and

(D) Fourth, that the defendant used or caused another to use wire communications in interstate commerce in furtherance of the scheme.

5.    **Factual Basis**

The parties agree that the following facts are true, accurately describe the defendant's role in the offense, and provide a sufficient factual basis for the defendant's guilty plea:

**Relevant Entities**

Holding Company A was a unitary thrift holding company based in the Eastern District of Michigan.  Holding Company A was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934.  In or around the fall of 2017, Holding Company A completed an initial public offering, and the company's stock began trading publicly on the Nasdaq Stock Market, a national securities exchange.

Financial Institution A was a federally insured depository institution established in or around 1984 that offered a broad range of loan products to the residential and commercial markets.  Financial

Institution A was a wholly owned subsidiary of Holding Company A (hereinafter, Holding Company A and Financial Institution A are collectively referred to as the "Bank"). Financial Institution A's headquarters and operational center were located in Southfield, Michigan, in the Eastern District of Michigan, with branches located in San Francisco, California; Los Angeles, California; Seattle, Washington; and New York, New York.

Most of Financial Institution A's senior management and operational functions were located in Southfield, Michigan. These operational functions and personnel included the majority of employees in the Underwriting Department and the Quality-Control Department. Financial Institution A's Underwriting Department received and reviewed loan applications submitted by the Bank's loan officers, including for residential loans, and determined whether the Bank should originate the loans. The Quality-Control Department audited loans and loan applications both before and after they were fully funded, to ensure they were in full compliance with the Financial Institution A's underwriting guidelines and policies.

Financial Institution A also employed loan officers who worked at the various branches and were responsible for originating residential loans. Financial Institution A used a commission-based compensation structure for loan officers that was based on the total dollar volume of the residential loans originated by the officer. Generally, the more loans that the loan officer originated, the more personal income the loan officer earned, and the more revenue that Financial Institution A generated through fees and interest associated with the loans.

**The Defendant and Relevant Individuals**

The defendant worked at Financial Institution A from in or around 2009 through in or around 2019. The defendant worked as a bank teller from 2009 through in or around 2011. The defendant served as a loan officer from in or around 2011 through in or around 2016, when she was promoted to Senior Loan Officer. In or around 2017, the defendant was promoted to Vice President and in or around 2018 was promoted again to Managing Director for Residential Lending, a position in which she oversaw the Bank's New York residential-lending operations. From in or around 2011 through in or around 2019, the defendant originated residential loans in various locations, including

San Francisco, New York, and Los Angeles.  The defendant also provided informal training, mentoring, and oversight to loan officers and staff throughout Financial Institution A's operations, and helped train and mentor more than 30 loan officers and loan assistants.  At all times relevant to this Information, the defendant acted within the scope of her agency and employment at Financial Institution A and Holding Company A, and with the intent, at least in part, to benefit Financial Institution A, Holding Company A, and the Bank's senior management, including Executive 1, Executive 2, Executive 3, and Executive 4.

Executive 1 was the founder and majority shareholder of Financial Institution A and provided oversight over the management of Financial Institution A, including its residential-lending programs.

Executive 2 served as Chief Operating Officer and Chief Financial Officer of Financial Institution A and provided oversight over the management of Financial Institution A, including its residential-lending programs.

Executive 3 served as President of Commercial and Retail Banking and the Chief Lending Officer of Financial Institution A, and

provided oversight over Financial Institution A's lending operations throughout the United States.

Executive 4 served as the Senior Vice President and Regional Director of Financial Institution A and provided oversight over Financial Institution A's residential-lending operations throughout California, including in Los Angeles and San Francisco.

**Financial Institution A's Residential Lending Operations**

It was the practice of Financial Institution A to make loans secured by real property to borrowers. Such loans were often called mortgages or mortgage loans. In determining whether or not to extend any such loan, it was also the practice of Financial Institution A's Underwriting Department to rely upon the information contained in the borrower's mortgage-related documents, such as the Uniform Residential Loan Application (or a "Form 1003") and supporting documentation provided by the borrower.

Form 1003, which was designed to be completed by the applicant borrower with the lender's assistance, required that the borrower truthfully provide to the lender various information, including employment information, monthly income, and detailed financial

information.  Form 1003 also required the borrower to provide specifics of the residential-property transaction, such as the purchase price and whether the borrower would use the property as a primary residence, secondary residence, or investment.

Near the end of Form 1003, the form required an attestation indicating that the borrower agreed and acknowledged to the lender that the information provided in the application:  (a) was true and correct and that any intentional or negligent misrepresentation of the information contained in the application may result in civil or criminal liability; and (b) would be supplemented in the event material facts changed prior to the closing of the loan.

**Financial Institution A's Advantage Loan Program**

a. *Overview of the Advantage Loan Program*

The origination of mortgage loans comprised the largest portion of Financial Institution A's loan portfolio.  In or around 2011, Financial Institution A created a residential loan program known as the Advantage Loan Program, which consisted of one, three, five, or seven-year adjustable rate mortgages.  The Advantage Loan Program was designed for members of the Asian community, with the primary

markets being San Francisco, Los Angeles, New York, and Seattle.  The program touted its "flexible" documentation requirements and fast underwriting and closing capabilities.  The program required a minimum 35% down-payment and charged higher rates and fees than were available elsewhere in the market, but it did not require submission of typical documentation, such as an applicant's tax returns or payroll records.

Employees and agents of Financial Institution A originated at least $5 billion in loans through the Advantage Loan Program between in or around 2011 and in or around 2019, including at least 1,288 Advantage Loan Program mortgage loans originated by the defendant, representing approximately $683,535,305 in credit extended by Financial Institution A.

The defendant worked closely with and at the direction of Executive 1, Executive 2, Executive 3, Executive 4, and others to develop, expand, and manage the Advantage Loan Program, including by, among other things, hiring, training, and mentoring loan officers and loan assistants, expanding the Bank's presence into new geographic markets, and participating in meetings with regulators and potential

investors during which the Advantage Loan Program was discussed.
Additionally, in or around 2018, the defendant began attending monthly
executive sales meetings with Executive 1, Executive 2, Executive 3,
and Executive 4, during which the Advantage Loan Program's
performance was discussed.

      b. *Financial Institution A's Underwriting Guidelines and Representations Regarding Underwriting for the Advantage Loan Program*

Financial Institution A's Underwriting Department maintained
internal underwriting guidelines (the "Underwriting Guidelines") that
governed the loan approval process for the Advantage Loan Program.
Underwriting Guidelines required loan officers to obtain various
documents from the borrower and the borrower's employer. According
to the Underwriting Guidelines, the loan officer would often be required
to obtain, among other records, documentation supporting the
borrower's employment and income including, for instance, a
verification of employment ("VOE") letter from the borrower's employer.
Generally, the VOE provided the borrower's title, salary, and start date
of employment. In some instances, the Underwriting Guidelines
allowed the borrower to provide bank statements to demonstrate a

pattern of income for the borrower in lieu of independent confirmation of income, such as pay stubs or a W-2.

In addition, as part of the application process for the Advantage Loan Program, if borrowers received funds to help with their down payments, the Underwriting Guidelines required the loan officers to obtain mortgage gift letters, which would memorialize the amount of the "gift," the nature of the relationship between the borrower and the donor, and that the borrower was under no obligation to return the money provided for the down payment on the residence.  Under these Underwriting Guidelines, only family members of the borrower were permitted to provide "gift" funds for a borrower's down payment.

Similarly, in some instances, Financial Institution A's Underwriting Department required loan officers to obtain "letters of explanation" from a borrower to address anomalous aspects of a borrower's loan application, or certain portions of the application that appeared to be inconsistent with the Underwriting Guidelines.  For example, a "letter of explanation" from the borrower might be required to document that the borrower was currently living with a family

member rent-free, or that negative information in the borrower's credit report had been appropriately addressed.

In addition to collecting these documents, loan officers were supposed to calculate the borrower's debt-to-income ratio. The debt-to-income ratio was a personal-finance measure that compared the amount of debt a borrower had to the borrower's overall income and was used to measure the borrower's ability to manage monthly mortgage payments. Taken together, the various documents obtained from the borrower and the borrower's employer, and related information, were critical to completing the Form 1003 and assessing the creditworthiness of a borrower's application.

In its public filings submitted to the SEC and disclosed to the investing public between in or around 2017 and in or around 2019, Holding Company A made certain material representations regarding Financial Institution A's Advantage Loan Program, including its underwriting process. For instance, in its SEC registration statement Form S-1/A, filed on or about November 7, 2017, Holding Company A claimed that the Bank's "board of directors and management team have created a risk-conscious culture that is focused on quality growth," and

that the Bank had "a disciplined and conservative underwriting approach[.]"  In these filings, Holding Company A described the Bank's loan officers as the "first line of defense for assuring credit quality and the integrity of our risk rating process[,]" and claimed that the Bank's loan approval process required the Bank's loan officers to obtain information from borrowers, meet face-to-face with each borrower, and produce a narrative document recommending the loan.

**Purpose of the Conspiracy**

It was the purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves and, in part, benefit the Bank by: (1) submitting false and fraudulent loan applications, and training other co-conspirator loan officers to submit false and fraudulent loan applications, for the Advantage Loan Program; (2) generating revenue for the Bank and earning money through commissions based on the volume of false and fraudulent loans originated under the Advantage Loan Program; and (3) concealing the conspiracy.

**The Manner and Means of the Conspiracy**

The defendant and others participated in a widespread conspiracy to engage in a sophisticated scheme centering on Financial Institution A's Advantage Loan Program.  The defendant and her co-conspirators agreed to commit the objects of the conspiracy as described in the Information.  The conspiracy included, but was not limited to, the following manner and means described below.

Members of the Bank's senior management encouraged the defendant and her co-conspirators to increase the volume of Advantage Loan Program loan originations in order to increase Financial Institution A's revenue.

With the knowledge and encouragement of members of Financial Institution A's senior management, including Executive 1, Executive 2, Executive 3, and Executive 4, the defendant and her co-conspirators falsified documents and material information about borrowers' qualifications for the Advantage Loan Program, and concealed material information about borrowers from Financial Institution A's Underwriting Department, in order to increase the volume of loans

originated under the Advantage Loan Program – which, in turn, increased the Bank's revenue – and their personal commissions.

The defendant and her co-conspirators knowingly provided Advantage Loan Program loans to borrowers involved in money laundering and tax-evasion activity. These borrowers operated businesses that did not report their taxable income to U.S. taxing authorities, and instead concealed and disguised the source and origin of their income. The defendant and her co-conspirators also provided loans to borrowers who hid their assets from the U.S. government in order to qualify for government-sponsored benefits.

In connection with loans provided to these and other borrowers, the defendant and her co-conspirators falsified and caused to be falsified: borrowers' income and debt-to-income ratios; information contained in Form 1003s, including borrowers' job titles, employment history, and whether the application was taken face-to-face; and supporting documents, including verification of employment letters, gift letters, face-to-face interview narratives, and letters of explanation. The defendant and her co-conspirators also directed borrowers to make

structured deposits to appear consistent with the falsified income included in their loan applications.

The defendant and her co-conspirators concealed information from Financial Institution A's Underwriting Department and Quality-Control Department that the defendant believed would delay or prevent the Bank from originating loans under the Advantage Loan Program.

The defendant and her co-conspirators sent, and caused to be sent, the loan applications and supporting documents containing false and fraudulent information to Financial Institution A's Underwriting Department through use of interstate wire communications. The purpose and foreseeable consequence of transmitting the falsified loan applications and supporting documents was to cause Financial Institution A's Underwriting Department to approve the fraudulent loans and disburse loan proceeds; to in turn cause Financial Institution A to pay the defendant and her co-conspirators commission fees; and to generate revenue for the Bank through increased loan originations.

The false and fraudulent information described above that the defendant and her co-conspirators included and caused to be included in Advantage Loan Program applications, was ultimately transmitted to,

and relied upon by, Financial Institution A and its Underwriting Department and caused Financial Institution A to originate residential mortgage loans and extend credit to borrowers that otherwise would not have qualified for credit from Financial Institution A based upon the Underwriting Guidelines.  The origination of the fraudulent loans directly increased the defendant and her co-conspirators' personal income through the generation of commissions and increased Financial Institution A's revenue through fees and interest associated with the origination of the fraudulent loans.

The defendant and her co-conspirators undermined Financial Institution A's ability to implement effective anti-money laundering controls to monitor, investigate, and report potentially suspicious activity involving Advantage Loan Program borrowers, in contravention of applicable anti-money laundering laws and regulations.  For example, the defendant and her co-conspirators would and did advise borrowers to transfer funds to third parties, who would then transfer the funds back to the borrowers by disguising such funds as "gifts."  In doing so, the defendant and her co-conspirators caused borrowers to create a series of layered transactions designed to conceal and obscure

the true source and origin of the funds used as down payments for the mortgages and to promote the underlying fraud scheme.

During the conspiracy period, the defendant originated at least 1,288 Advantage Loan Program mortgage loans, representing at least $683,535,305 in credit extended by Financial Institution A. Between in or around 2015 and in or around 2019, the overwhelming majority of the loans the defendant originated included one or more of the fraudulent actions described above, with the most common fabrication being the borrower's income, and the defendant earned approximately $3,381,355.26 in commissions, primarily as a result of the origination of these fraudulent loans.

The defendant committed all of the above acts knowingly and willfully, and with the intent to defraud. The defendant agrees that she used sophisticated means as part of the fraud scheme, meaning, especially complex and especially intricate offense conduct pertaining to the execution and concealment of the offense, and that $3,381,355.26 was the financial gain that she obtained from the conspiracy.

## 6.    Advice of Rights

The defendant has read the Information, has discussed the charges and possible defenses with her attorney, and understands the crime charged.  The defendant understands that, by pleading guilty, she is waiving many important rights, including the following:

A.    The right to plead not guilty and to persist in that plea;

B.    The right to a speedy and public trial by jury;

C.    The right to the assistance of an attorney at every critical stage of the proceedings, including trial;

D.    The right to an appointed attorney, if the defendant cannot afford to retain one;

E.    The right to be presumed innocent and to require the government to prove the defendant guilty beyond a reasonable doubt at trial;

F.    The right to confront and cross-examine adverse witnesses at trial;

G.    The right to testify or not to testify at trial, whichever the defendant chooses;

H.     If the defendant chooses not to testify, the right to have the jury informed that it may not treat that choice as evidence of guilt;

I.     The right to present evidence or not to present evidence at trial, whichever the defendant chooses; and

J.     The right to compel the attendance of witnesses at trial.

## 7.     Collateral Consequences of Conviction

The defendant understands that her conviction here may carry additional consequences under federal or state law.  The defendant understands that, if she is not a United States citizen, her conviction here may require her to be removed from the United States, denied citizenship, and denied admission to the United States in the future. The defendant further understands that the additional consequences of her conviction here may include, but are not limited to, adverse effects on the defendant's immigration status, naturalized citizenship, right to vote, right to carry a firearm, right to serve on a jury, and ability to hold certain licenses or to be employed in certain fields.  The defendant understands that no one, including the defendant's attorney or the Court, can predict to a certainty what the additional consequences of the defendant's conviction might be.  The defendant nevertheless

affirms that the defendant chooses to plead guilty regardless of any immigration or other consequences from her conviction.

### 8.   Defendant's Guideline Range

#### A.   Court's Determination

The Court will determine the defendant's guideline range at sentencing.

#### B.   Acceptance of Responsibility

The government recommends under Federal Rule of Criminal Procedure 11(c)(1)(B) that the defendant receive a two-level reduction for acceptance of responsibility under USSG § 3E1.1(a).  Further, if the defendant's offense level is 16 or greater and the defendant is awarded the two-level reduction under USSG § 3E1.1(a), the government recommends that the defendant receive an additional one-level reduction for acceptance of responsibility under USSG § 3E1.1(b).  If, however, the government learns that the defendant has engaged in any conduct inconsistent with acceptance of responsibility—including, but not limited to, making any false statement to, or withholding information from, her probation officer; obstructing justice in any way; denying her guilt on the offense(s) to which she is pleading guilty;

committing additional crimes after pleading guilty; or otherwise demonstrating a lack of acceptance of responsibility as defined in USSG § 3E1.1—the government will be released from its obligations under this paragraph, will be free to argue that the defendant not receive *any* reduction for acceptance of responsibility under USSG § 3E1.1, and will be free to argue that the defendant receive an enhancement for obstruction of justice under USSG § 3C1.1.

### C.    Other Guideline Recommendations

The parties recommend that the following guideline provisions apply to defendant's guideline calculation on Count 1:

- USSG Section 2B1.1(a)(1): Base Offense Level of 7
- USSG Section 2B1.1(b)(1)(I): Gain Greater than $1,500,000 (add 16 Levels)
- USSG Section 2B1.1(b)(10)(C): Sophisticated Means (add 2 levels)
- USSG Section 3B1.1(b) or (c): Aggravating Role (add 2 or 3 levels)

The parties agree to recommend that the Aggravating Role provision under USSG Section 3B1.1 of up to 3 levels applies.  However, there is no recommendation or agreement as to whether subsection (c) (add 2 levels) or subsection (b) (add 3 levels) applies to the defendant.

The parties have no other recommendations as to the defendant's guideline calculation as part of this agreement.

### D.   Substantial Assistance

If the government determines, in its exclusive judgment, that defendant has both complied with her obligations under this agreement and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), it will move the Court pursuant to USSG Section 5K1.1 to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines.

At this time the government makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance.  The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the United States.  The government's determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which

defendant testifies or in which the government otherwise presents information resulting from defendant's cooperation.

### E.    Parties' Obligations

Both the defendant and the government agree not to take any position or make any statement that is inconsistent with any of the guideline recommendations or factual stipulations in paragraphs 8.B, 8.C, or 8.D.  The government agrees to recommend only the applicability of the guidelines described by paragraphs 8.B, 8.C, and 8.D., but is free to rebut any guideline recommendation by the defendant that is not contemplated in paragraphs 8.B, 8.C, and 8.D. Other than the guideline recommendations in those paragraphs, however, the defendant is not restricted in what the defendant may argue or present to the Court as to the defendant's guideline calculation.

### F.    Not a Basis to Withdraw

The defendant understands that she will have no right to withdraw from this agreement or withdraw her guilty plea if she disagrees, in any way, with the guideline range determined by the Court, even if that guideline range does not incorporate the parties'

recommendations in paragraphs 8.B, 8.C, or 8.D.  The government likewise has no right to withdraw from this agreement if it disagrees with the guideline range determined by the Court.

**9.    Imposition of Sentence**

      **A.    Court's Obligation**

The defendant understands that in determining her sentence, the Court must calculate the applicable guideline range at sentencing and must consider that range, any possible departures under the sentencing guidelines, and the sentencing factors listed in 18 U.S.C. § 3553(a), and apply any applicable mandatory minimums.

      **B.    Imprisonment**

            **1.    Recommendation**

Under Federal Rule of Criminal Procedure 11(c)(1)(B), the government will recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range, provided that the offense level used by the Court to determine that range is 24 or higher prior to the application of any departure under USSG Section 5K1.1.

### 2.    No Right to Withdraw

The government's recommendation in paragraph 9.B.1 is not binding on the Court. The defendant understands that she will have no right to withdraw from this agreement or withdraw her guilty plea if the Court decides not to follow the government's recommendation.  The government likewise has no right to withdraw from this agreement if the Court decides not to follow the government's recommendation.  If, however, the Court rejects or purports to reject any other term or terms of this plea agreement, the government will be permitted to withdraw from the agreement.

### C.    Supervised Release

### 1.    Recommendation

Under Federal Rule of Criminal Procedure 11(c)(1)(B), the parties recommend that the Court impose a three-year term of supervised release.

### 2.    No Right to Withdraw

The parties' recommendation is not binding on the Court.  The defendant understands that she will have no right to withdraw from this agreement or withdraw her guilty plea if the Court decides not to

follow the parties' recommendation.  The defendant also understands
that the government's recommendation concerning the length of the
defendant's sentence of imprisonment, as described above in paragraph
9.B.1, will not apply to or limit any term of imprisonment that results
from any later revocation of the defendant's supervised release.

### D.     Fines

The parties do not recommend the imposition of a fine in this
matter.

### E.     Restitution

The parties recommend, pursuant to 18 U.S.C. § 3663A(c)(3)(B),
that restitution should not be ordered because "determining complex
issues of fact related to the cause or amount of the victim's [the bank's]
losses would complicate or prolong the sentencing process to a degree
that the need to provide restitution to any victim is outweighed by the
burden on the sentencing process."

### F.     Forfeiture

The defendant agrees, pursuant to 18 U.S.C. § 982(a)(2), and 18
U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c), to forfeit all property
constituting, or derived from, proceeds she obtained, directly or

indirectly, as the result of her violation of 18 U.S.C. § 1349 including, but not limited to, a forfeiture money judgment in the amount of $3,381,355.26.

The defendant agrees to the entry of one or more orders of forfeiture, including the entry of a Preliminary Order of Forfeiture, incorporating the forfeiture of the above referenced property following her guilty plea, upon application by the United States as mandated by Federal Rule of Criminal Procedure 32.2.  The defendant agrees that the forfeiture order will become final as to the defendant at the time entered by the Court.

The defendant knowingly, voluntarily, and intelligently waives any challenge to the above-described forfeiture based upon the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

The defendant acknowledges that she understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives her right to challenge any failure by the court to advise her of her rights with respect to forfeiture, set forth in Federal Rule of Criminal Procedure 11(b)(1)(J). The defendant also expressly waives her

right to have a jury determine the forfeitability of her interest in the above identified property, as provided by Rule 32.2(b)(5).

The defendant further waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, pronouncement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

The defendant agrees to hold the United States, its agents and employees, harmless from any claims whatsoever in connection with the seizure and forfeiture of any property referenced above.

### G.    Special Assessment

The defendant understands that she will be required to pay a special assessment of $100, due immediately upon sentencing.

## 10.    Appeal Waiver

The defendant waives any right she may have to appeal her conviction on any grounds.  If the defendant's sentence of imprisonment does not exceed the top of the guideline range determined by the Court, the defendant also waives any right she may have to appeal her sentence on any grounds.

11.  **Collateral Review Waiver**

The defendant retains the right to raise claims alleging ineffective assistance of counsel, as long as the defendant properly raises those claims by collateral review under 28 U.S.C. § 2255.  The defendant also retains the right to pursue any relief permitted under 18 U.S.C. § 3582(c), as long as the defendant properly files a motion under that section.  The defendant, however, waives any other right she may have to challenge her conviction or sentence by collateral review, including, but not limited to, any right she may have to challenge her conviction or sentence on any grounds under 28 U.S.C. § 2255, 28 U.S.C. § 2241, or Federal Rule of Civil Procedure 59 or 60.

12.  **Consequences of Withdrawal of Guilty Plea or Vacation of Judgment**

If the defendant is allowed to withdraw her guilty plea, or if the defendant's conviction or sentence under this agreement is vacated, the government may reinstate any charges against the defendant that were dismissed as part of this agreement and may file additional charges against the defendant relating, directly or indirectly, to any of the conduct underlying the defendant's guilty plea or any relevant conduct. If the government reinstates any charges or files any additional charges

as permitted by this paragraph, the defendant waives her right to challenge those charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

## 13. Use of Withdrawn Guilty Plea

The defendant agrees that if she is permitted to withdraw her guilty plea for any reason, she waives all of her rights under Federal Rule of Evidence 410, and the government may use her guilty plea, any statement that the defendant made at her guilty plea hearing, and the factual basis set forth in this agreement, against the defendant in any proceeding. The defendant's waiver of all rights under Federal Rule of Evidence 410 will be effective upon defendant's execution of this agreement.

## 14. Parties to Plea Agreement

This agreement does not bind any government agency except the United States Department of Justice, Criminal Division, Fraud Section.

## 15. Scope of Plea Agreement

This plea agreement is the complete agreement between the parties and supersedes any other promises, representations,

understandings, or agreements between the parties concerning the subject matter of this agreement that were made at any time before the guilty plea is entered in court.  Thus, no oral or written promises made by the government to the defendant or to the attorney for the defendant at any time before the defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this plea agreement. If the parties have entered, or subsequently enter, into a written proffer or cooperation agreement, though, this plea agreement does not supersede or abrogate the terms of that agreement.  This plea agreement also does not prevent any civil or administrative actions against the defendant, or any forfeiture claim against any property, by the United States or any other party.

**16.    Acceptance of Agreement by Defendant**

This plea offer expires unless it has been received, fully signed, by

5:00 PM on April 14, 2021. The government may withdraw from this

agreement at any time before the defendant pleads guilty.


DANIEL S. KAHN
Acting Chief
Fraud Section, Criminal Division
United States Department of Justice


JASON M. COVERT
KEVIN LOWELL
Trial Attorneys


Dated:  5/6/2021


By signing below, the defendant and her attorney agree that the

defendant has read or been read this entire document, has discussed it

with her attorney, and has had a full and complete opportunity to

confer with her attorney.  The defendant further agrees that she

understands this entire document, agrees to its terms, has had all of her

questions answered by her attorney, and is satisfied with her attorney's

advice and representation.


Page **34** of **35**

_____
Rees Morgan
Attorney for Defendant

Dated: 4/14/2021

_____
YiHou Han
Defendant