# EXHIBIT C

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/227252624

# Coercion in Intimate Partner Violence: Toward a New Conceptualization

**Article** *in* Sex Roles · June 2005

DOI: 10.1007/s11199-005-4196-6

CITATIONS
361

READS
8,724

**2 authors:**



Mary Ann Dutton
Georgetown University
74 PUBLICATIONS   5,868 CITATIONS

SEE PROFILE

Lisa A. Goodman
Boston College
160 PUBLICATIONS   13,385 CITATIONS

SEE PROFILE

All content following this page was uploaded by Lisa A. Goodman on 06 June 2014.

The user has requested enhancement of the downloaded file.

P1: KEG
sers2004.cls (04/06/2004 v1.1 LaTeX2e SERS document class) sjny165-sers-ny00004196 April 15, 2005 16:1

*Sex Roles, Vol. 52, Nos. 11/12, June 2005 (⃝C 2005)*
DOI: 10.1007/s11199-005-4196-6

# Coercion in Intimate Partner Violence: Toward a New Conceptualization

**Mary Ann Dutton**[1,3] **and Lisa A. Goodman**[2]

For decades, battered women's advocates have placed coercive control squarely at the center of their analysis of intimate partner violence. Yet, little work has been done to conceptualize and measure the key construct of coercive control. In this article, we apply French and Raven's social power model to a conceptualization of coercive control in intimate partner violence relationships. Central elements of the model include: social ecology; setting the stage; coercion involving a demand and a credible threat for noncompliance; surveillance; delivery of threatened consequences; and the victim's behavioral and emotional response to coercion. These elements occur in spiraling and overlapping sequences to establish an overall situation of coercive control. The implications of this model for theory and practice are discussed.

**KEY WORDS:** A1

For decades now, battered women's advocates have placed the notion of coercive control squarely at the center of their analysis of intimate partner violence (IPV). Indeed, they have defined IPV as a "pattern of coercive control" (Pence & Paymar, 1986) in which the batterer asserts his power over the victim through the use of threats, as well as actual violence. Violence is simply a tool, within this framework, that the perpetrator uses to gain greater power in the relationship to deter or trigger specific behaviors, win arguments, or demonstrate dominance (Dobash & Dobash, 1992). Other tools might include isolation, intimidation, threats, withholding of necessary resources such as money or transportation, and abuse of the children, other relatives, or even pets. Explaining the Duluth Model, a widely used batterer treatment program, Pence (1989), one of its founders, wrote that the program "assumes battering is not an individual pathology or mental illness but rather just one part of a system of abusive and violent behaviors to control the victim for the purposes of the abuser" (p. 30). And, in an eloquent description of "battered women's" responses, Stark (1995) wrote,

"Physical violence may not be the most significant factor about most battering relationships. In all probability, the clinical profile revealed by battered women reflects the fact that they have been subjected to an ongoing strategy of intimidation, isolation, and control that extends to all areas of a woman's life, including sexuality; material necessities; relations with family, children, and friends; and work. Sporadic, even severe violence makes this strategy of control effective. But the unique profile of 'the battered woman' arises as much from the deprivation of liberty implied by coercion and control as it does from violence-induced trauma" (p. 987).

Yet, despite this common assumption, borne out every day in the horrific stories told by battered women throughout the country, surprisingly little work has been done to conceptualize and measure the key construct of coercive control. In the absence of a clear conceptualization, measures of coercion, usually embedded within broader measures

[1]Department of Psychiatry, Georgetown University Medical Center, Washington, DC.
[2]Boston College, Chestnut Hill, MA.
[3]To whom correspondence should be addressed at Department of Psychiatry, Georgetown University Medical Center, 620 Kober Cogan Hall, Washington, DC, 20007; e-mail: mad27@georgetown.edu.

A2

0360-0025/05/0600-0743/0 ⃝C 2005 Springer Science+Business Media, Inc.

of psychological abuse, are neither comprehensive nor internally consistent. Researchers have variously included behaviors ranging from verbal put-downs to intimidation to kidnapping under the rubric of coercion. For a number of reasons, detailed below, the need for a tighter conceptualization and operationalization of this notion has gained new urgency in recent years.

First, despite over two decades of research on intimate partner violence (IPV) controversy concerning "gender symmetry," or the relative use of violence by men versus women is more heated than ever. This controversy has come to a head recently, as more and more women are being arrested in cases that police officers perceive as "mutual violence." One tradition of research—mainly conducted by family researchers—has consistently produced results indicating that women and men use violence at equal rates, and in some cases, women use violence more often (Straus & Gelles, 1990). Another body of research has demonstrated that men use violence, including homicide, against their female partners more often than women use violence against their male partners (Bachman & Saltzman, 1995) and that women's use of violence largely involves self-defense or fighting back (DeKeseredy et al., 1998; Saunders, 1986). Many researchers have pointed out that one reason (among many) for the absence of consensus on the relative use of violence by men versus women is that measurement of violent acts alone cannot adequately characterize violence in intimate partner relationships (DeKeseredy, 1998; Dutton, 1996; Edleson & Tolman, 1992; Smith, Smith, & Earp, 1999; Yoshihama, 2000). Rather, it is necessary to understand the use of, and response to, IPV in the context of the relationship and the cultural, social, and institutional systems within which the perpetrator and victim live (Dutton, 1996; Edleson & Tolman, 1992). Central to this context is the role of coercion. Greater attention to the role of coercion would enable researchers to sort out gender differences in the very nature of topographically similar acts, as well as their effects on victims' psychological wellbeing and future behavior.

A second and related reason for the urgent need to conceptualize and measure coercive control in violent relationships is the growing interest in developing subtypes of intimate partner violence, rather than lumping them together under one common rubric. A rubric that would enable us to make better distinctions could be extremely useful in numerous arenas, including batterer treatment, risk assessment, and safety planning for victims. A leader in this effort, Johnson (Johnson & Ferraro, 2000) has noted that

> "Partner violence cannot be understood without acknowledging important distinctions among types of violence, motives of perpetrators, the social locations of both partners, and the cultural contexts in which violence occurs" (p. 948).

Three chief features of Johnson's typology are: (1) his consideration of the couple as the unit of analysis; (2) his inclusion of women's potential use of violence; and, most relevant for this paper, (3) his focus on the broader context of potential coercion and control in intimate partner relationships.

Finally, and perhaps most urgently, the role of coercive control in IPV needs to be more thoroughly understood in the legal context. In that context, domestic violence is usually understood as a one-size-fits-all category, based on acts of assault alone without regard to the coercive context in which they occur. Moreover, the role of coercive control in extracting criminal conduct is rarely considered in criminal cases (Colvin et al., 2001). Much work needs to be done to bring the notion of coercion in IPV into the legal arena. Without attention to this critical element of IPV, legal actors hear only parts of the stories that victims bring them every day in court. A more discriminating understanding of the nature of specific IPV crimes, including the element of coercion, would help secure more appropriate sentencing, as well as treatment for the perpetrators, and more effective safety planning for victims (Erskine, 1999).

**THE SOCIAL BASES OF POWER**

As we will elaborate below, theoretical work exists on the concepts of coercion and control; however, few have attempted to integrate this work with our current understanding of violent intimate relationships. In the 1950s, stimulated by Lewin's work on power, which he defined as "the possibility of inducing forces of a certain magnitude on another person" (Lewin, 1935, p. 131), the Research Center for Group Dynamics began work on different aspects of group power and influence. In that context, French and Raven began to meet to develop a general theory of social power, defined, consistent with Lewin's work, as "potential influence" or the ability of an "agent" to influence a "target" (French & Raven, 1959).

French and Raven were interested in what sorts of resources a person might draw upon to exercise

P1: KEG
sers2004.cls (04/06/2004 v1.1 LaTeX2e SERS document class)    sjny165-sers-ny00004196    April 15, 2005    16:1

**Coercion in Intimate Partner Violence: Toward a New Conceptualization**    745

influence. Eventually, in a key paper (1959), they developed five bases of power, each involving one person's ability to impose, give, or administer tangible or intangible outcomes on another. In this model, we refer to the person who is doing the influencing is the "agent," and the person being influenced is the "target." Both men and women may be agents of coercion in their intimate relationship, as well as the targets of it from their intimate partners. We assume that coercion exists not only in intimate heterosexual relationships, but also in lesbian and gay male relationships as well.

Coercive power involves the agent's ability to impose on the target things the target does not desire, or to remove or decrease desired things. Reward power involves the agent's ability to give to the target things the target desires, or to take away or decrease things not desired. Neither of these bases of power can be used to change a target's privately held beliefs or values. Instead, only behavioral compliance is obtained, which depends on surveillance. The remaining bases of power can be used to actually change the target's beliefs. Legitimate power involves the agent's ability to impose on the target feelings of obligation or responsibility. Referent power involves the agent's ability to provide feelings of personal acceptance or approval based on the target's identification with the agent. Expert power involves the agent's ability to provide skill or expertise and arises from the target's belief that the expert has such expertise. A sixth basis, informational power, involving the agent's ability to provide knowledge or information, was added later (Raven, 1965).

More recently, Raven (1992) extended the original model into a Power/Interaction Model of Interpersonal Influence. This model's main advance was to offer a more dynamic view of power, distinguishing between *bases* of power (i.e., ability or potential to control), power *processes* (i.e., attempts to control), and *outcomes* of power (i.e., compliance or resistance; Bruins, 1999). This distinction adds clarity not previously articulated, indicating that the potential for abuse of power, the attempt to use power to coerce, and the achievement of control through compliance should be considered separately.

Coercive power is most central to theorizing about coercive control in violent relationships, although the remaining bases of power may also apply. Both can be distinguished from force in that force involves a complete lack of volition on the part of the target (Raven, 1993). That is, if sufficient force is imposed, the target has no discretion in responding (e.g., being forcefully held down while being raped). However, the target's response to coercion does involve choice, although not "free choice." Coercive power is based on the target's belief that the target can and will experience negative consequences for noncompliance (e.g., getting beaten for not having dinner on the table, partner will have sex with someone else; Raven, Center, & Rodriquez, 1975). The target can "choose" to comply (and hope to avoid threatened negative consequences) or risk punishment for noncompliance. Thus, the opportunity for resistance exists, but at a cost. Reward power also has a connection to coercive control in violent relationships since it is based on the target's belief that the agent can and will provide a reward in return for compliance (Raven, 1975). Thus, the agent's access to reward power (e.g., providing financial support, transportation, emotional intimacy) can be used to increase the target's probability of complying with the agent's coercion.

Several ancillary notions are essential to French and Raven's theory of social power. First, Raven (1993) argued that coercion may require softening the target or "setting the stage," where the agent demonstrates to the target that he has the means to exert coercion and is ready and willing to pay any associated costs. This might be demonstrated, for example, through a history of escalating IPV. Raven (1993) further stated that coercion could occur through invoking the power of a third party. In the case of IPV, for example, an agent could threaten to withdraw a petition for a visa or green card, or report false child abuse charges, thereby involving Immigration and Naturalization Services (INS) or Department of Social Services (DSS) officials, respectively.

Second, as noted above, central to the French and Raven's theory of social power is the notion that both coercion and reward power require surveillance. The agent needs to have information about the target's behavior to know whether or not the contingency for failure to comply needs to be imposed (Raven, 1993).

Third, both compliance and resistance are possible responses to coercion. Based on a program of empirical research regarding the processes of coercion with a college student sample in a laboratory design, Molm (1997) found, not surprisingly, that compliance increases over time when the probability of contingent punishment is high. More unexpectedly, however, greater power to punish and greater likelihood of being punished predicts greater resistance,

**746** **Dutton and Goodman**

as well as compliance (Molm, 1997). That is, compliant victims do not retaliate less and vice versa. Similarly, in a community-based study of IPV victims' responses to violence, we (Goodman, Dutton, Weinfurt, & Cook, 2003) found that battered women use increasing levels of both resistance and placating strategies as the violence increases in intensity. Together, these findings suggest that seemingly opposite responses to coercion co-occur as the level of threat increases.

These points serve to clarify the limitations of current measures of psychological abuse as measures of the distinct concept of coercive control. First, current measures of psychological abuse, for example, the Psychological Maltreatment of Women Inventory (Tolman, 1989, 1999) and the Work/School Abuse Scale (Riger, Ahrens, & Blickenstaff, 2001) typically are composed of items characterizing abusive acts or tactics without regard to their ability to actually control the partner. That is, these measures do not assess the contingent possibility of negative sanctions inherent in coercion. Second, current psychological abuse measures do not separate coercion (e.g., threat not to allow contact with family if a woman talks about past violence) from other forms of nonphysical abuse (e.g., humiliation, not allowed out of the house). Third, current measures do not distinguish the *process* of control (i.e., coercive tactics) from *outcomes* (i.e., compliance or resistance as end results). Verbal threats or a raised voice may constitute control tactics, but are not coercive unless they signal the threat of subsequent consequences for noncompliance (e.g., violent assault). Gender differences may be especially salient here, since women and men may differ in their ability to convey a credible threat, while they may differ less in their use of verbal insults or statements of humiliation.

## MODEL OF COERCION IN INTIMATE PARTNER VIOLENCE

In the next section, we apply the social power model (Raven, 1993; Molm, 1997), particularly its characterization of coercion, to a conceptualization of coercive control in relationships involving intimate partner violence. The resulting theoretical model of coercion in intimate partner violence is illustrated in Fig. 1.

Coercive control in intimate partner violence is a dynamic process linking a demand with a credible



**Fig. 1.** Model of coercion in intimate partner violence.

**Coercion in Intimate Partner Violence: Toward a New Conceptualization** 747

threatened negative consequence for noncompliance. A new measure of coercion in intimate relationships, under development by the authors,[4] identifies eight domains of control in which demands may be made. These domains were developed on the basis of the authors' clinical and forensic experience and with the help of a National Advisory Panel of 20 domestic violence experts. These domains include personal activities/appearance (e.g., demand to wear certain clothing or hairstyles), support/social life/family (e.g., refusal to allow target to seek help of counselor or talk with family members), household (e.g., demanding only specific foods be purchased), work/economic/resources (e.g., not allowing non-English speaking partner to learn English), health (e.g., not allowing target to obtain needed medications), intimate relationship (e.g., demanding target not use birth control), legal (e.g., demanding that the target engage in illegal activities), immigration (e.g., threats to report target to immigration officials), and children (threats to report target to child protective services). Examples from the authors' clinical and forensic experience of severe coercion in an intimate partner violent relationship may include the threat of physical assault for failure to engage in sexual demands, the threat of taking the children away from their mother if she fails to allow the abusive partner to return to the home following a separation, the threat of withdrawing immigration papers if an immigrant woman calls the police when her husband is violent, or a woman's threat of disclosing private information about her partner for failure to agree to send the children to the school of her choice. Less serious coercion in terms of physical harm—but psychologically harmful nevertheless—include a partner's threat to embarrass a woman in front of her family or friends, or to seek sex outside the relationship if a woman doesn't allow her partner to engage in unwanted sexual behaviors with her. In the next sections, we break down this broad conceptualization into the components of the model outlined in Fig. 1. The upper portion of the figure represents the agent's verbal or behavioral responses, while the lower portion characterizes the target's responses.

### Social Ecology

To understand the dynamics of coercive control requires attention to the social context in which it occurs. Economic, political, cultural, familial, social, and individual factors—as well as their interactions—give meaning to an abuser's coercive behavior (i.e., setting the stage for coercion, coercive threats, surveillance, carrying out threatened consequences) (Edleson & Tolman, 1992) and the partner's responses to it (i.e., the immediate cognitive, behavioral and emotional responses to coercive threats, ongoing traumatic effects of exposure to coercion; Dutton, 1996). Indeed, each of the components of our model, described below, can be understood only within the context of the social ecology that gives it meaning. Our own clinical experience has demonstrated that a man's threat to leave his partner means one thing if his partner is a new immigrant, entirely emotionally or economically dependent on him, but quite another if she is a wealthy American with plenty of social and emotional resources.

Virtually all relationships involve persuasion and influence according to theories of social power (French & Raven, 1959; Raven, 1992). At some point or another, many people even say things to their partners like, "If you don't X, I will Y...," with X ranging from "let me take you out to dinner" to "sell drugs for me," and Y ranging from "sulk" to "kill you." So whether a demand and contingent threat can be characterized as coercive is contextually dependent. For example, threatening to call the police unless one's partner puts down a weapon involves a demand (put down the weapon) followed by a threat of contingent negative consequences (call to police). No doubt, the individual brandishing the weapon would perceive the threat to be an aversive event. Yet, calling the police for protection and demanding that one's partner stop threatening with a weapon may be expected by others who believe that one should "do something" to stop the violence. Similarly, threatening to leave a relationship unless one's partner stops his abusive behavior would likely be viewed by most as socially acceptable behavior. Therefore, not only is context required to understand the nature of coercive behaviors and responses to them, but it is required even to determine whether a particular behavior should be considered as coercion at all.

### Setting the Stage

Given a sufficiently serious threat, coercion can occur in a relationship even when there has been no prior violence or threat to "soften" the partner's resistance. However, one might assume that the occurrence of violence in a relationship might make the victim particularly vulnerable to coercion, even when

---
[4]Funded by the National Institute of Justice.

**748**                                                                                                                        **Dutton and Goodman**

the immediate threat is minor. Once intimate partner violence occurs, a line has been crossed and the possibility remains that it will happen again, even though a woman may try to believe that it won't. The stage has been set. In these cases, the dynamics of coercion may be difficult to observe directly. Without an appreciation of the many ways in which the stage has been set to "prime" the target for coercion, recognizing a coercive threat and understanding a target's response to it may not be obvious. For example, it is difficult to appreciate the power of a threat to "give her what she deserves" if a woman looks at another man without knowing that her boyfriend previously had beaten her and held a knife to her throat because she looked at one of his friends in a way that he perceived as flirtatious. Thus, understanding coercive control necessitates knowing the foundations upon which coercion is built.

Four ways in which a partner can "set the stage" for coercion in the relationship include (1) creating the expectancy for negative consequences, (2) creating or exploiting the partner's vulnerabilities, (3) wearing down the partner's resistance, and (4) facilitating attachment. These are described in more detail below.

*Creating the Expectancy for Coercive Outcomes*

Communicating the ability, willingness, and readiness to control one's partner by punishing her or him or withholding rewards for noncompliance is defined here as creating an expectancy of coercion. Our own clinical experience has shown us that communication may be made through the abusive partner's previous actions directed toward his current partner (e.g., prior serious violence) or toward others (e.g., having seriously injured a previous partner). Similarly, the expectancy can be created through explicit statements, for example, that the abusive partner has connections with others who would harm her if he instructed them to do so; or that the abusive partner has a particular method in mind for killing his partner. In one forensic case example, a husband told his wife in detail how he was going to kill her after her grandmother arrived home the next day. These messages set the stage for the victim to believe that, when it is threatened, the negative consequence will be delivered. It gives the coercive process credibility.

Communicating the credibility of a threat can be done in an instant or cumulatively over the course of a relationship. That is, a threat would certainly be credible if there was some basis in behavioral history to suggest that it was plausible. For example, someone who previously has used serious violence with his partner, or with others, and who threatens to kill his partner— or to seriously injure her—would likely require little else to communicate credibility based on his ability (i.e., prior act), willingness (i.e., threat to do it again), and readiness (i.e., threat to do it at any moment) to carry out the threat. Importantly, depending on the nature of a threat, previous physical or sexual assault by the partner might be sufficient to indicate credibility of a subsequent threat.

*Creating or Exploiting Vulnerabilities*

Vulnerabilities increase a victim's susceptibility to certain forms of coercion. Our clinical experience has repeatedly demonstrated that economic liabilities increase vulnerability to threats involving money, credit, health insurance, child care and employment. Illness, injury, physical disability, pregnancy, or small physical stature increase vulnerability to the threat of physical assault. Motherhood increases vulnerability to threats involving children. Substance abuse or mental health problems increase vulnerability to all forms of abuse (Kilpatrick, Acierno, Resnick, Saunders, & Best, 1997), likely because these conditions may reduce one's ability to act effectively on one's own behalf. Illegal immigration status or legal problems increase vulnerability to threats involving exposure to police or other authorities (Gold, 2000; Hass, Dutton, & Orloff, 2000). Language barriers increase vulnerability to threats that involve increased social isolation. History of childhood abuse or other dysfunctional family history can increase vulnerability to threats involving relationship termination or psychological manipulation (Gold, 2000). **A2**

An individual may enter into a relationship with existing vulnerabilities or acquire them independently of her partner. These vulnerabilities can in turn be exploited by her abusive partner. In, one case, a woman with breast cancer was exploited when her abusive partner insisted that she remain in the relationship, stating that no one would want a woman with those defects. The birth of a child can be exploited if, for example, an abusive partner threatens to remove the child's coverage on his medical insurance if his partner does not comply with his desire for sex immediately following delivery of the child.

An abusive partner may intentionally create vulnerabilities in order to exert coercive control

P1: KEG
sers2004.cls (04/06/2004 v1.1 LaTeX2e SERS document class)   sjny165-sers-ny00004196   April 15, 2005   16:1

**Coercion in Intimate Partner Violence: Toward a New Conceptualization** 749

over his partner. Numerous clinical examples have shown that creating financial indebtedness by insisting that all expenses be charged on a credit card in the partner's name is not uncommon. Forcing one's partner to quit a job, become involved in illegal activities (e.g., fraud, elicit drugs) or engage in shameful experiences (e.g., sex with strangers, children, or animals) also can create vulnerabilities such as physical or mental health effects of traumatic violence exposure (Acierno, Resnick, Kilpatrick, Saunders, & Best, 1999; Stein & Kennedy, 2001), fear of future revictimization, or economic loss.

*Wearing Down Resistance*

Resistance to coercion is facilitated by tangible (e.g., economic resources, access to transportation, place to stay), social (e.g., emotional support) and personal (e.g., physical stamina, determination, willingness to take risks) resources. Abusers can undermine their partner's ability to resist coercive control by depleting these resources. For example, interfering with victims' social networks or using psychologically abusive tactics that damage a person's physical and psychological well-being wear down one's ability or will to resist. Separation from family and friends can create a sense of futility and despair. 'When resistance is lower, compliance with coercive demands may be more likely since there are fewer resources to combat the pressure to comply.

*Facilitating—and Then
Exploiting—Emotional Attachment*

.

Healthy relationships involve mutual emotional interdependence (Rusbult, Olsen, Davis, & Hannon, 2001; Walsh, 1982). However, when the emotional dependence in the relationship is extreme and unbalanced, the individual who is less dependent has greater power in the relationship. Emotional dependency can then be exploited by the partner who is less attached to the relationship.

The theory of traumatic bonding (Dutton & Painter, 1993) describes one example of this process, where the abusive partner simultaneously abuses and creates vulnerabilities in the victim, such that attachment to the abuser is required (e.g., beating one's partner and then caring for her injuries). In some cases, an abusive partner creates an emotional imbalance in the relationship by facilitating emotional dependency to exploit it. An imbalance of emotional attachment in the relationship may also stem from one partner's extreme emotional dependency as a personality style. Irrespective of how it develops, emotional dependency can be exploited by a coercive partner.

**Coercion**

We have operationalized coercion as a two-part construct involving a demand and a threat. Coercive threats are different from non-coercive threats, although they can be serious forms of abuse on their own. Coercive threats are contingent; they involve communication about both a demand and an associated credible threat (Molm, 1997; Raven, 1993; Raven, Center & Rodriques, 1995).

*Coercive Demand*

Central to the notion of coercive control is the idea of compliance with demands or expectations. A threatened negative outcome involved in coercion is contingent on one's failure to comply with the partner's "demand." The Merriam-Webster online dictionary (http://www.m-w.com/) defines "demand" as "to ask or call for with authority; to claim as due or just." This definition encompasses the "entitlement" that often characterizes a demand in violent intimate partner relationships.

Communication between human beings is complex and, thus, demands can be relayed in many different ways. The form of the statement that contains a demand can vary widely. Thus, demands may be communicated explicitly (e.g., "You'd better be home when I get here!") or implicitly (e.g., "You know what you need to do"). They may be communicated with or without words (e.g. raised fist or glare from across the room). A demand (e.g., "Don't walk out of this house…") may be communicated contemporaneously with a related threat (e.g., "…or I'll file for custody and take the kids") or years before the threatened consequence is to be carried out (e.g., "…or some day I'll find you").

Assessing coercive demands in intimate partner violence requires identifying not only obvious and discrete demands, but those that are integrated seamlessly into the day-to-day interactions of the partners' lives. Sometimes, demands don't even have to

P1: KEG
sers2004.cls (04/06/2004 v1.1 LaTeX2e SERS document class)    sjny165-sers-ny00004196    April 15, 2005    16:1

be stated explicitly to be understood as existent. For many women in abusive intimate relationships, the rituals of everyday life are illustrated by "I just knew that I had to ____ or else he would ____." Expectations become coercive demands when the expectation is held by the coercive partner and understood as such by the target and the price of noncompliance with those expectations is a contingent punishment or opportunity cost.

**Credible threat**

A threat may be explicit (e.g., "If you're not here when I get home, you'll get it worse than last night"). Alternatively, a threat may be communicated implicitly, relying on the pattern of the abuser's behavior over the course of the relationship (i.e., over time whenever a woman came home late form work, her partner started an argument, which often led to physical assault). In this example, an explicit statement of the threat is unnecessary after some period of time; it is clearly understood by both parties that when she doesn't come home when he expects her to, there will be the threat of consequences. In this latter case, abused women often report, "I just knew what would happen if I didn't do what he wanted me to do."

For a demand to be coercive, the contingent threat associated with it must be credible. Otherwise, the demand is without consequence; it is empty. The partner's prior behavior, described as "setting the stage" for coercion can communicate the degree of credibility with which a threat is delivered. Or information about the credibility of a threat may be communicated contemporaneously with a demand. Whenever it occurs, the agent's communication that he is able, willing, and ready to carry out a threat for noncompliance gives his threat credibility.

**Surveillance**

According to the theory of social power, coercion cannot work without surveillance (Raven, 1992)—or perhaps just the "victim's" belief that it is occurring. Since a threat is contingent on noncompliance, surveillance is required to determine whether compliance has occurred. Our clinical experience has shown that surveillance methods are commonplace in intimate partner violence. Abusers often use frequent phone calls to monitor their partner's whereabouts. Inspections to determine whether a woman cleaned all surfaces in the house as she was told, whether she had sex with someone else, or whether she drove the car a greater number of miles than the distance between her house and her job are but a few examples of surveillance. Even when an abuser does not actually use surveillance tactics, he or she can enhance the controlling value of a threat by persuading his partner that he or she does. Some IPV victims believe that their partners will "just know," or that he or she will inevitably find out, if one does what the other says or not.

Third parties are also involved in the surveillance process. In many of the first author's forensic cases, for example, children are recruited to report their mother's behavior to her partner, when they are questioned about who came to the house, who their mother talked to on the telephone, or when she returned home. Enlisting other family and friends to report on one's behavior allows an abuser to extend his or her surveillance far beyond that which one could reasonably conduct alone.

**Delivery of Threatened Negative Consequences**

The dispensing of threatened negative consequences can serve to set the stage for later coercive acts to be successful, that is, to result in compliance. For example, when a man threatens to "teach his wife a lesson" for not having sex with him, and then rapes her when she refuses, the likelihood of her compliance the next time is increased (Molm, 1997). Since coercive threats often involve various acts of IPV, when actually delivered, they contribute to the cumulative pattern of intimate partner violence and abuse in the relationship. Of course, coercive control doesn't require a threatened consequence to be actually delivered—only creation of the belief that it could be enacted.

**Vulnerability to Coercion**

The proposed model of coercion recognizes that individuals enter intimate relationships with different levels of vulnerability to coercion. As described above, these vulnerabilities may vary in nature, but each constitutes a wedge which can be used to effectively coerce the person. Vulnerability to coercion does not necessarily reflect a weakness or deficit.

P1: KEG
sers2004.cls (04/06/2004 v1.1 LaTeX2e SERS document class)    sjny165-sers-ny00004196    April 15, 2005    16:1

**Coercion in Intimate Partner Violence: Toward a New Conceptualization**                                751

Vulnerability to coercion can arise from something that the partner can exploit or take away. For example, someone with considerable independent financial resources is likely not easily coerced by the threat of withholding money for groceries, while someone who depends on a welfare check may be more easily coerced in this way. Similarly, having small children or elderly parents provides another target against which coercive threats can be made. In this model vulnerability to coercion may be created by the partner through years of maltreatment and abuse or the person may enter the relationship with notable vulnerabilities that provide a ready avenue for coercion by a partner who is so inclined. Numerous clinical cases by the first author have involved women who have revealed vulnerabilities (e.g., history of childhood abuse) to their partner in an effort to seek support or to gain greater intimacy only to find that the information is later used to threaten them with humiliation or a repeat of prior victimization.

### Cognitive, Emotional, and Behavioral Responses to Coercion

Three different categories of short-term response to coercive acts include the extent of (1) victims' cognitive appraisal of a coercive threat as signaling credible risk, (2) compliance or resistance as a behavioral response to an abuser's demands, and (3) fear arousal.

*Threat Appraisal: Cognitive Response to Coercion*

Since coercion operates out of a threat of future negative consequences, the power of coercive control is tied to the perception a threat. Threat appraisal is a variable pertaining to the "victim's" cognitive response, which is distinct from the acts of coercive threats by a "perpetrator." A threat may yet to have been carried out (e.g., threat to kill, kidnap the children), but one can examine the response to the threat alone separate from the response to the consequences for compliance or noncompliance especially when the threatened consequence is not immediate. Thus, coercive control relies in part on the perception of threat by the target of coercive threats. Without the perception of a credible threat coercion cannot occur.

A single threat may dictate a target's behavior for years, while she or he holds the (accurate or inaccurate) assumption that the threat is real and ongoing. Further, one study of coping among women (Hudek-Knezevic & Kardum, 2000) found that threat appraisal was a central component of stress. Yet, why women take some threats seriously and not others is unclear. Some threats are nearly universally credible, for example threats to kill when an angry man holds a loaded gun at a woman's head. Many others are less clear to observers who don't have knowledge of the relationship history—especially intimate partner violence.

While no formal theory has yet been developed to explain women's own IPV risk assessment, recent research suggests that battered women's violence threat appraisal is related to various risk factors, such as severity of prior violence (Mechanic, Weaver, & Resick, 2000) abuser characteristics (e.g., drunkenness, drug use, unemployment, relationship estrangement, and use of controlling behaviors; Gondolf & Heckert, 2003), social support and PTSD (Dutton, 2003). Furthermore, a woman's prior interpersonal relationships can teach her about the credibility of IPV threats. For example, she may have learned from a previous partner that when he got angry, he was more likely than not to beat or physically assault her. Through the process of generalization, she may have learned to expect that when men get angry, they will hurt her. In the case of a new partner, her threat appraisal may not be unreasonable, even if it is inaccurate.

In coercion, the detection of risk is usually accompanied by the target's belief that if he or she does something to keep the partner happy or not to make that person angry she could avoid further violence and abuse–or other threatened consequences. The understanding of this contingency suggests some level of perceived control over the risk of harm from their partner. However, in violent intimate partner relationships, this control is often elusive. First, in some cases, a coercive "demand" may be nonspecific and focus not on what a person is expected to *do* (or not do), but on what outcome she or he is expected to *accomplish* (i.e., not make the partner angry). Even if one intends to comply with a "nonspecific" demand, it is much more difficult—since knowing what would make the partner happy may be subtle or change over time. Indeed, many women report that they had complied with what they had been "told" to do, only to find out that their partner now wanted them to do something else – or to do it differently. Of course, nothing she does may ever satisfy her partner and, thus, her "noncompliance" is used to

P1: KEG
sers2004.cls (04/06/2004 v1.1 LaTeX2e SERS document class) sjny165-sers-ny00004196 April 15, 2005 16:1

justify—in the mind of the abuser—the violence that follows. Secondly, one observation is that even when a threat is coercive (i.e., implies a contingency depending on the target's compliance), it may actually matter little what the target does to comply. A threat may be meant to terrorize the partner, not to extract a particular response. By believing "if only I do what he or she wants, I can keep my partner from carrying out the threat," one may attempt to gain some level of (perceived) control over both how one views their relationship with the partner, as well as feelings of terror. If one were to believe, instead, that the partner was intent on terrifying the other, that the partner will abuse regardless of what one does, and that she or he has little control over what the does or doesn't do, she could no longer deny the danger to oneself and one's children, nor avoid feeling the terror that comes with that recognition. Yet, as with both coercive and non-coercive threats, the target has no real control. Avoiding a threatened consequence is always in the control of the agent, not the target, even when the "victim" complies with a demand.

*Compliance and Noncompliance:*
*Behavioral Response to Coercion*

Responding to a demand can involve compliance, noncompliance, or both. As discussed above, our previous research (Goodman et al., 2003) supports the findings of Molm (1997) which indicates that as the severity of violence increases, both battered women's resistance and placating (i.e., compliance) increase.

Experience working with battered women suggests that they frequently resist their partner's demands, and they do so in a variety of ways. In some cases, noncompliance is oblique; one does not directly confront the partner with a refusal. At other times, one may quite explicitly and directly resist the partner's control. In some cases, the failure to comply is about "giving up"—feeling desperation and lack of energy to respond to a partner's incessant demands and abuse, such as when a woman says, "Go ahead and kill me, just get it over with— I'm not going to do what you want." At other times, the defiance is a clear and simple "no, I won't." Of course, sometimes the abuser makes good on a threat. At other times, in that moment, the threatened consequence is not forthcoming. However, the abuser can taunt his or her partner by indicating that the threat-

ened consequence will occur—just in his or her own time.

One may comply by "going along" with a partner's demands. Sometimes, the person may find it to be easier than resisting. Complying doesn't necessarily mean that one "wants" to do what the partner demands; more likely the individual is trying to create safety for oneself and one's children. Sometimes compliance with expectations or demands can become internalized or routine—with those actions taking on the appearance of being "voluntary." The day-to-day "rules" imposed by an abusive partner may be those that one becomes accustomed to as a personal risk management strategy—even without recognizing the extent of compliance.

**Fear Arousal: Emotional Response to Coercion**

Cognitive appraisals of threat are commonly associated with distressful affective responses including PTSD (Lobel & Gilat, 1998; Piotrkowski & Brannen, 2002). Further, some theories of threat appraisal (Loewenstein, Weber, Hsee, & Welch, 2001) emphasize the role of affect, versus cognition, for explaining threat appraisal. Regardless, the interconnectedness between feelings, cognitions, and behavior suggests that fear, cognitive appraisals of threat, and behavioral responses to coercion cannot be understood without recognizing the influence of each on the other.

Increased arousal can influence one's thoughts and behavior (Lazarus, 1999). For example, fear may focus the woman's attention on the narrow view of immediate danger, rather than on the long-term consequences of her response to it (e.g., fighting back, reaching for a knife). Emptying a revolver, rather than considering whether the first shot may have stopped an intruding abusive partner as he came through a barricaded door, is another example of fear taking precedent over cognitive problem-solving.

**Outcomes of IPV Coercion**

Exposure to coercive acts means exposure to threats of harm , including those that would be considered traumatic stressors such as threats of harm to self or others (American Psychiatric Association, 2000). Many types of threatened consequence in violent intimate relationships meet the event criterion for posttraumatic stress disorder (American

P1: KEG
sers2004.cls (04/06/2004 v1.1 LaTeX2e SERS document class)    sjny165-sers-ny00004196    April 15, 2005    16:1

**Coercion in Intimate Partner Violence: Toward a New Conceptualization**                                                      753

Psychiatric Association, 2000):

> "the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others" (p. 467).

It would not be surprising, then, to find that the consequences of coercive control include the range of mental health (e.g., posttraumatic stress symptoms, depression, anxiety) and physical health (gastrointestinal problems, sleep problems, hypertension headaches; Dutton, Haywood, & El-Bayoumi, 1997) problems associated with traumatic exposure (American Psychiatric Association, 2000; Dutton et al., 1997).

Although few studies have explored this question, a large body of research does show that intimate partner violence is associated with more severe mental health consequences than is physical violence. In a recent meta-analysis of the mental health impact of IPV, the prevalence of PTSD ranged from 31 to 84.4% (Golding, 1999). These rates are significantly higher than the estimated lifetime prevalence of 10.4% in the general population of women (Kessler, Sonnega, Bromet, Hughes, & Nelson, 1995) and 25.8% among women with a history of crime victimization (Resnick, Kilpatrick, Dansky, Saunders, **A2** & Best, 1993). Further, PTSD rarely occurs alone (Kessler et al., 1995). One of the most common comorbid diagnoses among women with PTSD is major depression (Breslau, Davis, Peterson, & Schultz, 1997). In the same meta-analysis of the mental health outcomes of IPV, the prevalence of depression ranged from 15 to 70% (Golding, 1999). These rates are compared to the lifetime rates observed in the general population (10.2–21.3%; **A2** Kessler et al., 1995; Weissman, Bruce, Leaf, Florio, **A2** & Holzer, 1991). In fact, IPV is a risk factor for suicide among women in general (e.g., Abbott, **A2** Johnson, Koziol-McLain, & Lowenstein, 1995; **A2** Bergman & Brismar, 1991) and specifically among **A2** African American women (Kaslow et al., 1998). In addition to mental health outcomes, IPV is also associated with negative behavioral and health outcomes.

Research has also shown that the adverse mental health outcomes of IPV are independently associated with psychological abuse, including both control/domination and emotional/verbal abuse (Dutton, Goodman, & Bennett, 1999). However, there is little research examining the impact of living with ongoing IPV threat such as in the case of coercion when a threat has been made, but the delivery of the threatened consequence has yet to occur. Our own research with battered women has shown that greater appraisal of future IPV threat is related to both subsequent PTSD and depression, even after controlling for prior levels of IPV (Dutton, Goodman, Weinfurt, & Vankos, 2001). The role of a woman's own behavioral compliance (vs. resistance) and the extent to which she believes her own actions can control whether threats can be averted, is also an important line of research to consider in understanding the outcomes of IPV coercion.

Physical health outcomes, including health promoting behaviors, risky health behaviors, and physical health status, are also relevant outcomes of exposure to IPV, although existing studies have yet to parcel out the impact of coercion from other forms of exposure. In addition to the physical injury that results from IPV, research has demonstrated a significant relationship between IPV and poor health outcomes, including self-reported health status, somatic symptoms, risk of illness, and exacerbated medical conditions (Campbell et al., 2002; Campbell, 2002; Campbell & Lewandowski, 1997). In a national sample, women who had experienced severe violence during the past year reported twice as many days in bed due to illness during the previous month than those who experienced minor or no violence (Gelles & Straus, 1988). In a primarily African American (62%), employed sample (85%) of women recruited from two university-affiliated family practice clinics, physical IPV was associated with self-reported poor physical health and having had more than five physician visits in the past year (Coker, Smith, Bethea, King, & McKeown, 2000). Physical violence was also associated with hearing loss, angina, other heart or circulatory conditions, frequent bladder or kidney infections, having a hysterectomy, and gastric reflux. Psychological violence was associated with self-reported poor physical health as well as other specific medical problems, including chronic neck or back pain, arthritis, migraines or other frequent headaches, and stomach ulcer. In a sample of 234 primarily White battered women, participants retrospectively reported a decline in their physical health status during and after a violent relationship (Follingstad, Brennan, Hause, Polek, & Rutledge, 1991). More than 50% of the sample reported specific physical complaints including persistent headaches (57%), back and limb problems (55%), and stomach problems (55%). The literature linking IPV to health outcomes is growing, but we still know very little about the long-term physical health status.

P1: KEG
sers2004.cls (04/06/2004 v1.1 LaTeX2e SERS document class)   sjny165-sers-ny00004196   April 15, 2005   16:1

## IMPLICATIONS

In this final section, we list a few potential uses of this model of coercive control in IPV. Both research and practice implications are discussed.

### Research

The model of IPV coercion elaborated in this paper can guide researchers in their exploration of a number of important research questions. First, the model can serve as the basis for measurement development. Indeed, we are now developing and validating a measure that taps each of the model's components, including setting the stage, surveillance, and responses to coercion, in addition to the demand and threatened consequence at the core of coercive control. We hope to use this measure to explore the nature of coercive control in a variety of populations.

Second, this model can enrich our exploration of the complex context in which violence occurs, enabling us to move beyond an accounting of specific assaultive acts. Our conceptualization of coercive control can, for example, inform the debate over whether men and women use violence at the same rates. Women are reported to use violence at rates comparable to that of men (Archer, 2000), although research also suggests that women are significantly more likely to report experiencing severe, frequent levels and negative consequences of IPV (Archer, 2000; Berk, Berk, Loseke, & Rauma, 1983; Campbell, 1993; Dobash, Dobash, Wilson, & Daly, 1992; Follingstad, Wright, Lloyd, & Sebastian, 1991; Holtzworth-Monroe, Smutzler, & Bates, 1997; Molidor & Tolman, 1998; O'Leary, 2000; Zlotnick, Kohn, Peterson, & Pearlstein, 1998). Indeed, the proposed model allows us to explore specific elements of the context in which men and women use coercion, as well as acts of violence and abuse. Topographically similar threat behavior may be accompanied by different contextual events (i.e., nature of demands and threats, "setting-the-stage," surveillance, enactment of consequences) for men versus women. Differences in the nature of coercion between other groups (e.g., first vs. chronic offenders, heterosexual vs. lesbian vs. gay male couples) can also be examined using this model as a conceptual guide.

Third, a model of coercion in IPV may allow us to deepen our understanding of the developmental sequence of IPV. Previous research has demonstrated the progression from psychological abuse to physical assault (O'Leary, Malone, & Tyree, 1994). Yet, it is unclear how coercion fits into this developmental perspective. For example, does the severity of coercion progress on a trajectory along with physical and sexual assault or separately from it? Does coercion pre-date or follow the onset of severe physical violence? When abusers stop using physical assault following batterer treatment, for example, do they continue to use coercion? Do different components of the model become more salient?

Fourth, this model could be helpful in furthering our understanding of whether there are different "types" of batterers. Existing typologies (Gondolf, 1999; Hamberger, Lohr, Bonge, & Tolin, 1996, 1997; Holtzworth-Munroe, Meehan, Herron, Rehman, & Stuart, 2003; Holtzworth-Munroe, Rehman, & Herron, 2000) may be further refined by including coercion and control, along with severity of physical violence. Typologies of violent couple relationships that already take coercive control into account (Johnson, 1995; Johnson & Ferraro, 2000) might be enriched by this more refined conceptualization of that elusive construct.

### Practice

The model of coercive control in IPV presented here can also be useful as a tool for advocacy and batterer intervention. Using this framework may allow service providers to talk with men and women in a more sophisticated way, unraveling the complex dynamics involved in coercion and partner violence more generally. Better information about the patterns of violence—including coercion—gained from both batterers and victims can help us to tailor our interventions with regard to safety planning with victims, batterer treatment, and mental health interventions with both victims and perpetrators.

In the legal arena, this more refined conceptualization of coercion in relationships with IPV might assist prosecutors and defense attorneys to explain more adequately both victim and perpetrator behavior in physical and sexual assault cases involving intimate partners. Legal professionals might be able to understand more thoroughly the pattern of abuse within which specific violent acts take place; and therefore be able to make more informed decisions about perpetrator dispositions and victim safety.

Over time, we have become better and better at understanding the complexities of IPV, bringing sexual abuse, psychological abuse, and stalking into our

models. With this conceptualization of coercive control, we can take one more step in disentangling the phenomenon of intimate partner violence and come one step closer to stopping it.

## ACKNOWLEDGMENTS

Grant 2001-WT-BX-0503 from the National Institute of Justice supported the development of this model through a research grant. We gratefully acknowledge the guidance of our National Advisory Board.

## REFERENCES

Acierno, R., Resnick, H., Kilpatrick, D. G., Saunders, B., & Best, C. L. (1999). Risk factors for rape, physical assault, and post-traumatic stress disorder in women: Examination of differential multivariate relationships. *Journal of Anxiety Disorders*, *13*(6), 541–563.

American Psychiatric Association. (2000). *Diagnostic and statistical manual DSM-IV-TR*. Washington, DC: Author.

Archer, J. (2000). Sex differences in physical aggression to partners: A reply to Frieze (2000), O'Leary (2000), and White, Smith, Koss, & Figueredo (2000). *Psychological Bulletin*, 126(5), 697–702.

Bachman, R., & Saltzman, L. (1995). *Violence against women: Estimates from the redesigned survey, Special Report. (No. NCJ-154348)*. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

Berk, R., Berk, S., Loseke, D., & Rauma, D. (1983). Mutual combat and other family victim myths. In D. Finkelhor, D. Gelles, G. Hotaling, & M. Straus (Eds.), *The Dark Side of Families* (pp. 197–212). Beverly Hills: Sage.

Campbell, J. (1993). *Men, women and aggression*. New York: Basic Books.

Campbell, J., Snow Jones, A., Dienemann, J., Kub, J., Schollenberger, J., O'Campo, P., Carlson Gielen, A., & Wynne, C. (2002). Intimate partner violence and physical health consequences. *Archives of Internal Medicine, 162*, 1157–1163.

Campbell, J. C. (2002). Health consequences of intimate partner violence. *The Lancet, 359*, 1331–1336.

Campbell, J. C., & Lewandowski, L. A. (1997). Mental and physical health effects of intimate partner violence on women and children. *Anger, aggression, and violence, 20*, 353–369.

Coker, A. L., Smith, P. H., Bethea, L., King, M. R., & McKeown, R. E. (2000). Physical health consequences of physical and psychological intimate partner violence. *Archives of Family Medicine, 9*(451–457).

Dobash, R., Dobash, R., Wilson, M., & Daly, M. (1992). The myth of sexual symmetry in marital violence. *Social Problems, 39*, 71–91.

Dutton, D. G., & Painter, S. (1993). Emotional attachments in abusive relationships: A test of traumatic bonding theory. *Violence & Victims, 8*(2), 105–120.

Dutton, M. A. (1996). Battered women's strategic response to violence: The role of context. In J. L. Edleson & Z. Eisikovits (Eds.), *Future interventions with battered women and their families*. (pp. 105–124). Thousand Oaks, CA: Sage.

Dutton, M. A. (2003, October). *Determinants and Social Context of Battered Women's Threat Appraisal*. Paper presented at the International Society for Traumatic Stress Studies, Chicago, IL.

Dutton, M. A., Goodman, L. A., & Bennett, L. (1999). Court-involved battered women's responses to violence: The role of psychological, physical, and sexual abuse. *Violence & Victims, 14*(1), 89–104.

Dutton, M. A., Goodman, L. A., Weinfurt, K., & Vankos, N. (2001). *IPV Threat Appraisal*. Paper presented at the Annual Meeting of the International Society for Traumatic Stress Studies, New Orleans, LA.

Dutton, M. A., Haywood, Y., & El-Bayoumi, G. (1997). Impact of violence on women's health. In *Health care for women: Psychological, social, and behavioral influences.* (pp. 41–56). Washington, DC, US: American Psychological Association.

Edleson, J. L., & Tolman, R. M. (1992). *Intervention for men who batter: An ecological approach*. Thousand Oaks, CA: Sage.

Follingstad, D., Wright, S., Lloyd, S., & Sebastian, J. (1991). Sex differences in motivations and effects in dating violence. *Family Relations, 40*, 51–57.

Follingstad, D. R., Brennan, A. F., Hause, E. S., Polek, D. S., & Rutledge, L. L. (1991). Factors moderating physical and psychological symptoms of battered women. *Journal of Family Violence, 6*, 81–95.

French, J. R. P., Jr., & Raven, B. (1959). The bases of social power. In *Studies in Social Power.* (pp. 150–167). Oxford, England: University of Michigan, Oxford, England.

Gelles, R., & Straus, M. (1988). *Intimate violence: The causes and consequences of abuse in the American family*. New York: Touchstone.

Gold, S. N. (2000). *Not trauma alone: Therapy for child abuse survivors in family and social context*. New York, NY: Brunner-Routledge.

Gondolf, E. W. (1999). MCMI-III results for batterer program participants in four cities: Less "pathological" than expected. *Journal of Family Violence, 14*(1), 1–17.

Gondolf, E. W., & Heckert, D. A. (2003). Determinants of women's perceptions of risk in battering relationships. *Violence & Victims, 18*(4), 371–386.

Goodman, L. A., Dutton, M. A., Weinfurt, K., & Cook, S. (2003). The intimate partner violence strategies index: Development and application. *Violence & Victims, 9*(2), 163–186.

Hamberger, L. K., Lohr, J. M., Bonge, D., & Tolin, D. F. (1996). A large sample empirical typology of male spouse abusers and its relationship to dimensions of abuse. *Violence & Victims, 11*(4), 277–292.

Hamberger, L. K., Lohr, J. M., Bonge, D., & Tolin, D. F. (1997). An empirical classification of motivations for domestic violence. *Violence Against Women, 3*(4), 401–423.

Hass, G. A., Dutton, M. A., & Orloff, L. E. (2000). Lifetime prevalence of violence against Latina immigrants: Legal and policy implications. *International Review of Victimology, 7*(1–3), 93–113.

Holtzworth-Munroe, A., Smutzler, N., & Bates, L. (1997). A brief review of the research on husband violence. *Aggression and Violent Behavior, 2*(3), 285–307.

Holtzworth-Munroe, A., Meehan, J. C., Herron, K., Rehman, U., & Stuart, G. L. (2003). Do subtypes of maritally violent men continue to differ over time? *Journal of Consulting & Clinical Psychology, 71*, 728–740). US: American Psychological Assn, US, http://www.apa.org.

Holtzworth-Munroe, A., Rehman, U., & Herron, K. (2000). General and spouse-specific anger and hostility in subtypes of martially violent men and nonviolent men. *Behavior Therapy, 31*(4), 603–630.

Hudek-Knezevic, J., & Kardum, I. (2000). The effects of dispositional and situational coping, perceived social support, and cognitive appraisal on immediate outcome. *European Journal of Psychological Assessment, 16*(3), 190–201.

Johnson, M. (1995). Patriarchal terrorism and common couple violence: Two forms of violence against women. *Journal of Marriage and the Family, 57*, 283–294.

Johnson, M. P., & Ferraro, K. J. (2000). Research on domestic violence in the 1990s: Making distinctions. *Journal of Marriage & the Family, 62*(4), 948–963.

Kilpatrick, D. G., Acierno, R., Resnick, H. S., Saunders, B. E., & Best, C. L. (1997). A 2-year longitudinal analysis of the relationships between violent assault and substance use in women. *Journal of Consulting & Clinical Psychology, 65*(5), 834–847.

Lazarus, R. S. (1999). *Stress and emotion: A new synthesis.* New York, NY: Springer.

Lobel, T. E., & Gilat, I. (1998). The relationship between perceived probability of personal harm and distressful reactions during the Gulf War. *International Journal of Stress Management, 5*(2), 93–102.

Loewenstein, G. F., Weber, E. U., Hsee, C. K., & Welch, N. (2001). Risk as feelings. *Psychological Bulletin, 127*(2), 267–286.

Mechanic, M. B., Weaver, T. L., & Resick, P. A. (2000). Intimate partner violence and stalking behavior: Exploration of patterns and correlates in a sample of acutely battered women., *Violence & Victims, 15*, 55–72). US: Springer Publishing, http://www.springerpub.com.

Molidor, C., & Tolman, R. (1998). Gender and contextual factors in adolescent dating violence. *Violence Against Women, 4*(2), 180–194.

Molm, L. D. (1997). *Coercive poser in social exchange*. Cambridge, United Kingdom: Cambridge University Press.

O'Leary, D. (2000). Are women really more aggressive than men in intimate relationships: Comment on Archer. *Psychological Bulletin, 126*, 685–689.

O'Leary, K. D., Malone, J., & Tyree, A. (1994). Physical aggression in early marriage: Prerelationship and relationship effects. *Journal of Consulting & Clinical Psychology, 62*(3), 594–602.

Piotrkowski, C. S., & Brannen, S. J. (2002). Exposure, threat appraisal, and lost confidence as predictors of PTSD symptoms following September 11, 2001. *American Journal of Orthopsychiatry, 72*(4), 476–485.

Raven, B. H. (1992). A power/interaction model of interpersonal influence: French and Raven thirty years later. *Journal of Social Behavior & Personality, 7*(2), 217–244.

Raven, B. H. (1993). The bases of power: Origins and recent developments. *Journal of Social Psychology, 49*(4), 227–251.

Riger, S., Ahrens, C., & Blickenstaff, A. (2001). Measuring interference with employment and education reported by women with abusive partners: Preliminary data. In *Psychological Abuse in Violent Domestic Relations*. (pp. 119–133). New York, NY: Springer, http://www.springerpub.com.

Rusbult, C. E., Olsen, N., Davis, J. L., & Hannon, P. A. (2001). Commitment and relationship maintenance mechanisms. In *Close Romantic Relationships: Maintenance and Enhancement.* (pp. 87–113). Mahwah, NJ, US: Erlbaum.

Stein, M. B., & Kennedy, C. (2001). Major depressive and post-traumatic stress disorder comorbidity in female victims of intimate partner violence. *Journal of Affective Disorders, 66*(2, 3), 133–138.

Tolman, R. (1989). The development of a measure of psychological maltreatment of women by their male partners. *Violence and Victims, 4*, 173–189.

Tolman, R. (1999). The validation of the Psychological Maltreatment of Women Inventory. *Violence and Victims, 14*, 25–37.

Walsh, F. (1982). *Normal family processes.* New York, NY, US: Guilford.

Zlotnick, C., Kohn, R., Peterson, J., & Pearlstein, R. (1998). Partner physical victimization in a national sample of American families. *Journal of Interpersonal Violence, 13*(1), 156–166.

P1: KEG
sers2004.cls (04/06/2004 v1.1 LaTeX2e SERS document class)   sjny165-sers-ny00004196   April 15, 2005   16:1

## Queries to Author:

A1:  Au: Please provide key words of this article.
A2:  Au: Please include this reference in the reference list.

View publication stats