REES F. MORGAN (CA State Bar No. 229899)
ef-rfm@cpdb.com
SEAN P.J. COYLE (CA State Bar No. 233039)
ef-spc@cpdb.com
MARCIA V. VALENTE (CA State Bar No. 321852)
ef-mvv@cpdb.com
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104-5500
Telephone:  415.391.4800
Facsimile:  415.989.1663

Attorneys for Defendant
YIHOU HAN

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br><br><br>YIHOU HAN,<br><br>　　　　　Defendant. | CASE NO. 2:21-cr-20256-LVP-DRG-1<br><br>**SENTENCING MEMORANDUM OF YIHOU HAN**<br><br>Judge: Honorable Linda V. Parker |

## REDACTED VERSION OF DOCUMENT TO BE SEALED

## TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................8

II.   BACKGROUND ................................................................10

    A.   Yihou's Early Life and Upbringing in China. ..........................10

    B.   Yihou Immigrates to the United States in 2003......................11

    C.   Yihou Enters a Short-Lived, Abusive Marriage in 2008..........12

    D.   Yihou Joins Sterling Bank in 2009. ..........................................13

III.  THE OFFENSE CONDUCT AND AFTERMATH .........................14

    A.   The Offense Conduct: Yihou Participates in a Conspiracy
        Centered on Sterling Bank's Advantage Loan Program...........14

        1.   REDACTED
            .................................................................15

        2.   Sterling Bank Creates the ALP in the Summer of
            2011 and Yihou Becomes Its Top Producer..................17

        3.   REDACTED
            . ....................19

        4.   Sterling Bank Terminates Yihou's Employment in
            2019. .........................................................................22

    B.   The Post-Offense Conduct: Yihou Immediately Accepts
        Responsibility for Her Conduct. ...............................................23

    C.   The Devastating Post-Offense Consequences. .........................26

IV.   THE SENTENCING GUIDELINES CALCULATION....................27

V.    ARGUMENT .....................................................................29

    A.   Yihou's Substantial Assistance Merits a 5K1.1
        Downward Departure.................................................................30

    B.   The Section 3553(a) Factors Support a Non-Custodial
        Sentence. ..................................................................................32

        1.   Yihou Is a First-Time Offender Who Has Fully
            Accepted Responsibility...............................................32

2.    The Nature and Circumstances of the Offense Strongly Support Leniency.............................................35

3.    A Custodial Sentence Is Not Necessary to Achieve Just Punishment and Respect for the Law.....................37

4.    Incarceration Is Not Necessary to Protect the Public Or for Specific Deterrence. ................................39

5.    Incarceration Is Not Necessary for General Deterrence......................................................................40

6.    The Proposed Sentence Is Commensurate with Yihou's Role Relative to Others' Participation in the Offense and Will Lessen the Significant Sentencing Disparity........................................................42

7.    The Proposed Sentence Is Consistent with Sentences Given to Defendants in Other Fraud Cases. ................................................................44

C.    Forfeiture, Fine, and Restitution. ............................................46

VI.    CONCLUSION .....................................................................48

SENTENCING MEMORANDUM OF YIHOU HAN

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007).................................................................................28, 29

*Kimbrough v. United States,*
    522 U.S. 85 (2007).......................................................................................29

*Koon v. United States,*
    518 U.S. 81 (1996).......................................................................................36

*Nelson v. United States,*
    555 U.S. 350 (2009).....................................................................................27

*Pepper v. United States,*
    562 U.S. 476 (2011).....................................................................................29

*Rita v. United States,*
    551 U.S. 338 (2007).....................................................................................27

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x. 93
    (2d Cir. 2008)..............................................................................29, 35, 41

*United States v. Amy Lu,*
    21-CR-00084.................................................................................................43

*United States v. Britt,*
    27 F. App'x 862 (9th Cir. 2001) .................................................................37

*United States v. Coughlin,*
    No. CRIM. 06-20005, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008).................38

*United States v. Dean,*
    80 F.3d 1535 (11th Cir. 1996), opinion modified on
    reconsideration, 87 F.3d 1212 (11th Cir. 1996) ....................................46

*United States v. Edwards,*
    595 F.3d 1004 (9th Cir. 2010) ...................................................................42

*United States v. Gaind*,
829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) ...............41

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................................29, 35

*United States v. Hao Liang Hu*,
21-CR-00097 (CD Cal.)........................................................................43

*United States v. Nesbeth*,
188 F.Supp.3d 179 (E.D.N.Y. 2016) ...................................................40

*United States v. Prosperi*,
686 F.3d 32 (1st Cir. 2012)...................................................................40

*United States v. Redemann*,
295 F.Supp.2d 887 (E.D. Wis. 2003) ..................................................38

*United States v. Rossi*,
422 F. App'x 425 (6th Cir. 2011) .........................................................36

*United States v. Vigil*,
476 F. Supp. 2d 1231 (D.N.M. 2007) *aff'd*, 523 F.3d 1258 (10th
Cir. 2008) ..............................................................................................37

*United States v. Walker*,
918 F.3d 1134 (10th Cir. 2019) ...........................................................38

**Statutes**

18 U.S.C.
§ 1349..............................................................................................8, 23, 46
§ 3553(a)(1) .........................................................................................*passim*
§ 3553(a)(2) ...................................................................................................8
§ 3553(a)(6) ...........................................................................42, 44, 46
§ 3572(a)(1) .................................................................................................46
§ 3572(a)(2) .................................................................................................46

U.S.S.G.
    Ch. 2 ............................................................................................................28
    Ch. 3 ............................................................................................................28
    § 2B1.1 ........................................................................................................45
    § 2B1.1(a)(1) ...............................................................................................28
    § 2B1.1(b)(1)(I) ...........................................................................................28
    § 2B1.1(b)(10)(C) ........................................................................................28
    § 3B1.1 ........................................................................................................28
    § 3B1.1(b) ....................................................................................................28
    § 3E1.1(a) ....................................................................................................28
    § 3E1.1(b) ....................................................................................................28
    § 5C1.1(c)(3) ...............................................................................................31
    § 5K1.1 ..........................................................................................9, 30, 31
    § 5K1.1(a)(2) ...............................................................................................30
    § 5K1.1(a)(3) ...............................................................................................31
    § 5K1.1(a)(5) ...............................................................................................31
    § 3553(a) .......................................................................10, 29, 32, 36
    § 3553(a)(2)(B) ...........................................................................................42

## Other Authorities

Aris Teon, *Directness, Hierarchy and Social Roles in Chinese
    Culture*, The Greater China Journal (March 9, 2017) .......................................21

*Banker pleads guilty in scheme that implicates S.F. Giants owner*
    (The Detroit News, May 19, 2021) (available at
    https://www.detroitnews.com/story/news/local/detroit-
    city/2021/05/19/banker-pleads-guilty-scheme-implicates-san-
    francisco-giants-owner/5162377001/) ..................................................................27

Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill.
    Univ. L. J. 485, 493 (1999)..................................................................................41

Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High
    Cost of Ignoring Science*, 91 Prison J. 48S, 50S, 60S (2011) ...........................39

*Fraud Friday—Bank Executive Pleads Guilty to Scheme That
    Implicates Giants Baseball Team Owner* (Coleman Report, May
    28, 2021) (available at https://colemanreport.com/coleman-
    movers-shakers-warren-baas-michael-donato-and-lindsey-hagerty-
    2/) ...........................................................................................................................27

Hannah Seligson, *For American Workers in China, a Culture Clash*, N.Y. Times (Dec. 23, 2009).................................................................22

L. Kevin Hamberger et al., *Coercive Control in Intimate Partner Violence*, 37 Aggression & Violent Behavior 1, 3 (2017) .................................20

Mary Ann Dutton & Lisa Goodman, *Coercion in Intimate Partner Violence: Toward a New Conceptualization*, 52 Sex Roles 743, 747 (2005).............................................................................................17

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, United States Sentencing Commission, May 2004 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf) .......................39

Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005)............................................................................................41, 43

T. K. Logan et al., *A Mixed-Methods Examination of Sexual Coercion and Degradation Among Women in Violent Relationships Who Do and Do Not Report Forced Sex*, 22 Violence and Victims 71 (2007)............................................................................................21

T. K. Logan et al., *Silenced Suffering: The Need for a Better Understanding of Partner Sexual Violence*, 16 Trauma, Violence, & Abuse 111, 115 (April 2015).........................................................21

U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence* (available at http://nij.gov/five-things/pages/deterrence.aspx#addenda).................................42

U.S. Department of Justice Office of Violence Against Women, https://www.justice.gov/ovw/domestic-violence (last visited August 2, 2024)....................................................................................17

## I.   <u>INTRODUCTION</u>

The Court is set to sentence Yihou Han ("Yihou") on August 20, 2024.  On May 19, 2021, under a cooperation plea agreement, Yihou pled guilty to one count of Conspiracy to Commit Bank Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349, as a result of her participation in Sterling Bank & Trust F.S.B.'s ("Sterling Bank") flagship Advantage Loan Program.

It is now time for the Court to determine a fair and just sentence, one that takes into consideration Yihou's history and characteristics and the nature and circumstances of her offense.  We respectfully submit that a sentence of 36 months of probation that includes conditions requiring six months of home detention is a fair and just sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  A number of factors support this below-Guidelines sentence:

- Yihou is a first-time offender with a history of service to her community and her family.  The conduct that brings Yihou before the Court stands alone as a deeply regretted aberration in an otherwise admirable life.

- Yihou immediately accepted responsibility and cooperated with the government.  Pursuant to her plea agreement, Yihou provided the government with full and comprehensive information—information that ultimately led to the successful prosecution of Sterling Bancorp, Inc.,[1] as well as enforcement actions against other parties participating

---

[1] Sterling Bancorp Inc. (the "Holding Company") was a Southfield, Michigan-headquartered holding company.  Upon information and belief, its primary business was the operation of its wholly-owned subsidiary, Sterling Bank, through

in the scheme.  In recognition of Yihou's exceptional and substantial cooperation, the Department of Justice has agreed to move, pursuant to U.S.S.G. § 5K1.1, for a downward departure from the recommended sentencing guideline range.

- Yihou has already paid dearly for her offense with her livelihood, her health, her community, her reputation, and her financial security.

- The public interest will also not be served by putting Yihou in prison. She is already prohibited from working in the banking industry.  She has done everything possible to mitigate the harm she caused, by providing immediate, full, and substantial cooperation to authorities, and by agreeing to an order of forfeiture.

Before the instant offense, Yihou led a fully law-abiding and honorable life.

According to those who know her, Yihou is "a good woman, always trying to do her best"; "one of the most hard-working, trustworthy and compassionate people" who "gives of herself to a fault"; a woman whose "life represents the quintessential story of an immigrant coming to America in search of the American dream, still caring for her mother and father" and "tireless in her efforts to help the community."  Declaration of Marcia Valente Ex. A, Tab 4 (T. Fang Ltr.).[2]  To one friend, Yihou "is the most generous and kindhearted person . . . [a] true friend that many can count on."  Ex. A, Tab 10 (R. Leung Ltr.).

---

which the Holding Company offered residential and commercial loans, and retail banking services.

[2] A compendium of 20 letters written in support of Yihou is attached as Exhibit A to the Declaration of Marcia Valente ("Valente Decl.").  The letters are in alphabetical order by last name and sequentially tabbed.  Exhibits attached to the Valente Decl. are identified herein as "Ex. __."

\*      \*      \*

U.S.S.G. Section 3553(a) requires the Court to fashion a sentence "sufficient, but not greater than necessary," to serve the purposes of sentencing. We respectfully ask the Court to consider the nature of the conduct, the nature of the punishment, and the nature of the defendant, and to sentence Yihou to 36 months of probation with a special condition of six months of home detention.

## II.   **BACKGROUND**

### A.   **Yihou's Early Life and Upbringing in China.**

Yihou was born and raised in Wuhan, China, in a working class family. ECF No. 28, PageID.159 (Initial Presentence Report ("PSR") ¶¶ 57, 59).  Her father worked as a carpenter, and her mother worked in sales and marketing for a beverage company.  *Id.* (PSR ¶ 57).  While Yihou did not want for basic necessities, she did not have a happy childhood.  *See id.* (PSR ¶ 58).  Due to China's one-child policy implemented in the 1980s, her parents were unable to have additional children and wished that Yihou was a boy.  *Id.*  REDACTED

████████████████████████████████████████████████████████

████████████████████████████████████████████████████  *Id*.

Yihou was a studious and hardworking child, and she did well academically. Ex. A, Tab 6 (J. Han Ltr.).  Mindful of her family's financial circumstances, she worked part-time to help with household expenses from an early age.  *Id.*  Yihou

graduated from high school and attended Wuhan University of Science and

Technology.  ECF No. 28, PageID.162 (PSR ¶ 75).  Unfortunately, Yihou had to

drop out of college in 2003 when she moved to the United States.  *Id*.

**B.**     **Yihou Immigrates to the United States in 2003.**

In 2003, at a surprise to her family, Yihou and her family were granted entry

to the United States.  ECF No. 28, PageID.159 (PSR ¶ 59).  Yihou's parents had

applied for entry 15 years prior, following the Chinese Cultural Revolution, but

never heard anything.[3]  *Id*.  On September 9, 2003, one week before her twenty-

first birthday, Yihou and her mother arrived in California; Yihou's father joined

them six months later.  Ex. A, Tab 6 (J. Han Ltr.), Tab 18 (Y. Tian Ltr.).  Yihou's

parents sold everything they owned in order to afford the move to California, and

fervently believed in the American dream and their ability to succeed in their

adopted country.  *See* Ex. A, Tab 6 (J. Han Ltr.) and Tab 18 (Y. Tian Ltr.).

The Han family's first year in America was extremely difficult.  Yihou

spoke very little English, her parents spoke no English at all, and the family had no

income or friends.  *See* Ex. A, Tab 18 (Y. Tian Ltr.).  The Han family lived in a

small, one-bedroom apartment in Oakland, California, which they shared with

relatives.  *See id*.; ECF No. 28, PageID.159 (PSR ¶ 60).  The family was barely

---

[3] Yihou's grandfather, a victim of the Chinese Cultural Revolution, had sponsored
the family's immigration.  He immigrated to the United States in 1982, starting a
new life for himself in San Francisco.  Ex. B (Y. Han Ltr.).

making ends meet and Yihou's parents would cry in their despair and loneliness. *See* Ex. A, Tab 18 (Y. Tian Ltr.).  Yihou shouldered an immense burden knowing her parents had left their homeland to provide a better future for their only child. Ex. B (Y. Han Ltr.).

Shortly after arriving in California, Yihou's father found work as a carpenter for a cabinet factory, and her mother worked as a maid for an elderly couple in San Francisco.  ECF No. 28, PageID.159 (PSR ¶ 57).  Yihou, for her part, worked at a Chinese-owned travel agency in San Francisco's Chinatown and took ESL classes at night.  ECF No. 28, PageID.162 (PSR ¶¶ 76, 79).  Yihou lived with her parents, helping them pay rent and other living expenses.  Ex. A, Tab 6 (J. Han Ltr.).

The Han family eventually moved from Oakland to San Francisco, into the house owned by the elderly couple that employed Yihou's mother.  Ex. A, Tab 17 (L. Tian Ltr.).  The Han Family lived downstairs in a bedroom inside the garage. Ex. A, Tab 6 (J. Han Ltr.) and Tab 17 (L. Tian Ltr.).  Although the family finally had a place of their own to call home, Yihou assured her mother that they wouldn't live in a garage forever.  Ex. A, Tab 17 (L. Tian Ltr.).

### C. Yihou Enters a Short-Lived, Abusive Marriage in 2008.

In December 2007, approximately four years after immigrating to the United States, Yihou married ███ REDACTED ███.  ECF No. 28, PageID.159 (PSR ¶ 61).  Yihou had met ███ on a Chinese dating website and thought they made a

perfect match: his family also came from Wuhan, he held a steady job working in technology sales, and he offered the promise of a better life.  Ex. B (Y. Han Ltr.). Unfortunately, the marriage was short lived.

In early 2009, a little more than a year after their wedding, Yihou left her husband and returned to her parents' one-bedroom apartment.  Ex. B (Y. Han Ltr.).

<div style="background:black; color:white; text-align:center;">REDACTED</div>

██████████████████████████████████████████████████████.
ECF No. 28, PageID.159 (PSR ¶ 61).  Yihou left the marriage with no assets and more than $20,000 in debt.  Ex. B (Y. Han Ltr.). The couple divorced in January 2010.  ECF No. 28, PageID.159 (PSR ¶ 61).

### D.   Yihou Joins Sterling Bank in 2009.

Despite the emotional and financial toll from her divorce, Yihou felt relieved to leave behind a bad marriage and was ready for a fresh start.  Ex. B (Y. Han Ltr.). In May 2009, Yihou started working at Sterling Bank's Portola branch as a bank teller.  ECF No. 28, PageID.152, 155 (PSR ¶¶ 11, 27).  She was 26 years old, without a college degree, and absolutely no experience in the banking or lending industry.  ECF No. 28, PageID.155 (PSR ¶ 27).  Her starting salary was $29,000, but she was so excited by this opportunity after the end of her abusive marriage. *Id.*

## III.   THE OFFENSE CONDUCT AND AFTERMATH

### A.   The Offense Conduct: Yihou Participates in a Conspiracy Centered on Sterling Bank's Advantage Loan Program.

Beginning in 2011, through 2019, Yihou participated in a conspiracy centering on Sterling Bank's Advantage Loan Program ("ALP"). ECF No. 28, PageID.153 (PSR ¶ 15). As part of her guilty plea, Yihou admitted that she and her co-conspirators would falsify documents and material information about borrowers' qualifications for the ALP to increase the volume of loans—which, in turn, increased Sterling Bank's revenue—and their personal commissions. ECF No. 28, PageID.153 (PSR ¶ 16); PageID.58–59 (Plea Agreement). Yihou further admitted that her falsification of documents and material information about borrowers' qualifications for the ALP was done with the knowledge and encouragement of members of Sterling Bank's senior management. ECF No. 28, PageID.153 (PSR ¶ 16); ECF No. 11, PageID.58 (Plea Agreement).

There is no excuse for Yihou's participation in this unlawful scheme. The simple and honest explanation for her behavior is that she did not think her actions through. Yihou wanted to do her job well, help her customers, and gain the respect of her supervisors. ECF No. 28, PageID.155 (PSR ¶ 30). She realizes now that she should have asked more questions about the ALP, as well as demanded more training in the mortgage and lending industry. ECF No. 28, PageID.154–155 (PSR ¶ 24).

We provide the Court with further details of Yihou's offense conduct not to excuse it—she knows she committed a serious crime and fully acknowledges that she alone is responsible for her conduct. We do so, rather, to provide the Court with information about the nature and circumstances of the offense, specifically Yihou's motivation for, involvement in, and knowledge of the extent of the fraud. *See* 18 U.S.C. § 3553(a)(1).

**1.**                       **REDACTED**

It is impossible to understand Yihou's experience at Sterling Bank, and particularly with respect to her offense conduct, without examining her relationship with Scott Seligman ("Seligman"), Sterling Bank's founder and controlling shareholder.[4]  ECF No. 28, PageID.152 (PSR ¶ 12).  In 1984, when Yihou was not yet two years old, Seligman chartered Sterling Bank, then known as Sterling Savings and Loan Association.  ECF No. 28, PageID.155 (PSR ¶ 26).  Seligman is also a real estate developer and a minority shareholder of the San Francisco Giants major league baseball team.  *Id.*

Yihou first met Seligman in December 2009, when he visited Sterling Bank's Portola branch and talked with her on the teller line.  ECF No. 28,

---

[4] Upon information and belief, throughout Yihou's tenure at Sterling Bank, Seligman served as consulting director to the Board of Sterling Bank, Vice President of the Holding Company, and, through various personal and family trusts, controlling shareholder of the Holding Company.

PageID.155 (PSR ¶ 28). Soon, Yihou was transferred to Sterling Bank's

Montgomery Street branch, just blocks away from Seligman's corporate office in

San Francisco. *Id*. Seligman visited this branch one day while Yihou was

working, and he invited her to tour his office on the 40th floor of the Transamerica

Pyramid Building. *Id*.          REDACTED

          . *Id*.          REDACTED

          . *Id*.

          REDACTED          . ECF

No. 28, PageID.155 (PSR ¶ 29).          REDACTED

          . *Id*. REDACTED

          REDACTED

. *Id*.          REDACTED

          . *Id*.          REDACTED

          . *Id*.

          REDACTED

          . Ex. B (Y. Han Ltr.).          REDACTED

          REDACTED

          REDACTED

          . *Id*. Unfortunately, that expressed love and desire

manifested as ongoing psychological and emotional abuse as time went on. *See*

*What Is Domestic Violence?*, U.S. Department of Justice Office of Violence Against Women, https://www.justice.gov/ovw/domestic-violence (last visited August 2, 2024) ("Domestic violence is a pattern of abusive behavior in any relationship that is used by one partner to gain or maintain power and control over another intimate partner."); Ex. C (Mary Ann Dutton & Lisa Goodman, *Coercion in Intimate Partner Violence: Toward a New Conceptualization*, 52 Sex Roles 743, 747 (2005)) (describing intimate partner abuse as multifaceted and centered around coercive control).[5] ███████ REDACTED ███████

████████████████████████████████████

████████████████████.

### 2. Sterling Bank Creates the ALP in the Summer of 2011 and Yihou Becomes Its Top Producer.

After Yihou expressed interest in Sterling Bank's loan program, Seligman quickly had her promoted to Assistant Loan Officer and then Loan Officer—even though she had no experience in residential lending and received no formal training from Sterling Bank in loan underwriting. ECF No. 28, PageID.155 (PSR ¶ 30). Instead, Yihou learned how to originate loans through on-the-job training by shadowing other loan officers. Ex. B (Y. Han Ltr.). Through these promotions, Yihou came to understand the impact Seligman could have on her career. *Id.*

---

[5] ███████ REDACTED ███████

████████████████████

In the summer of 2011, Sterling Bank created the ALP, which was headed and developed by Seligman, Thomas Lopp (Chief Operating Officer and Chief Financial Officer), Michael Montemayor (President, Commercial & Retail Banking and Chief Lending Officer), and Jonathan Kolk (Head of Underwriting).[6] *See* ECF No. 28, PageID.153 (PSR ¶¶ 13, 15).  Although Yihou was still a junior loan officer who had been working in lending for less than one year, she was recruited to help with the program and soon became its top producer.  ECF No. 28, PageID.153, 155 (PSR ¶¶ 13, 15, 30).

Yihou understood the ALP to be another form of loans that Sterling Bank was marketing to members of the Asian Community—new immigrants, with little credit history and jobs that paid in cash.  *See* ECF No. 28, PageID.153 (PSR ¶ 13). Yihou believed that the ALP protected Sterling Bank through large down payments that mitigated risk, while giving a lifeline to new Asian immigrants lacking sufficient credit for traditional mortgages.  Ex. B (Y. Han Ltr.).  She also understood—through colleagues and her direct supervisor, John Frelich (Vice

---

[6] Both Montemayor and Kolk had previously worked at the now-defunct World Saving Bank, and had made millions of low documentation "NINA" ("no income, no assets") loans before joining Sterling Bank.  Ex. B (Y. Han Ltr.).  Kolk later worked at Sterling Bank's headquarters and managed underwriting of the ALP loans.  *Id.*  Montemayor, as President of Retail and Commercial Banking and Chief Lending Officer, supervised that department, including Kolk.  *Id.*

President, Residential Lending)—that the forms of verification used by Sterling

Bank were compliant with regulations.[7]  Ex. B (Y. Han Ltr.).

3.  ███████████ REDACTED ███████████.

The ALP was popular and in 2015, Seligman asked Yihou to help expand

the ALP's portfolio lending area to new regions.  *See* ECF No. 28, PageID.153,

156 (PSR ¶¶ 15, 31).  During this period, Yihou was promoted to Vice President

and Regional Residential Lending Manager.  ECF No. 28, PageID.152 (PSR ¶ 11).

In 2018, Sterling Bank promoted Yihou to Managing Director of Residential

Lending.  *Id.*  She held that position for slightly more than one year, reporting

directly to Montemayor, the Chief Loan Officer.  *See* ECF No. 28, PageID.153

(PSR ¶ 15).

███████ REDACTED ███████

████████.  ECF No. 28, PageID.156 (PSR ¶ 31).  REDACTED

███████ *Id.* ███ REDACTED ███

███████████████████

███████████████████

███ *Id.* ████ REDACTED ████

---

[7] Yihou relied on representations from senior management as there was just a very short passage in Sterling Bank's loan handbook that detailed the ALP procedures. Ex. B (Y. Han Ltr.).

████████████████████████████████████  *Id.*  ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  *Id.*  ███████████████████████████████████████

████████      *Id.*  Dynamics such as these are common in abusive relationships and especially effective at creating a culture of control.  *See, e.g.*, Ex. D (Hamberger et al., *Coercive Control in Intimate Partner Violence*, 37 Aggression & Violent Behavior 1, 3 (2017)) ("[I]t is important to note that vulnerabilities and related threats are not limited to violence.  For example, the systematic tearing down of the target's self confidence and trust in her own decisions, opinions and abilities commonly seen in IPV may make her vulnerable to threats of abandonment . . . , judgment, humiliation, or failure if the perpetrator's desires are not met.  In this way, the consequences of a pattern of emotional abuse may make a target more vulnerable to coercive control.").

████████████████████████████████████████████████████

████████. ECF No. 28, PageID.156 (PSR ¶ 32).  ████████████████████

████████████████████████████████  *Id.*  ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  *Id.*  Research on abusive relationships identifies sexual violence as deeply impactful because it

"attack[s] core aspects of bodily integrity, autonomy, and trust."  Ex. E (Logan et al., *Silenced Suffering: The Need for a Better Understanding of Partner Sexual Violence*, 16 Trauma, Violence, & Abuse 111, 115 (April 2015)); *see also* Ex. F (Logan et al., *A Mixed-Methods Examination of Sexual Coercion and Degradation Among Women in Violent Relationships Who Do and Do Not Report Forced Sex*, 22 Violence and Victims 71 (2007)) (noting that "sexual assault within the context of a violent relationship contributes to mental health problems even after controlling for severe physical violence.")

**REDACTED**

. ECF No. 28, PageID.156 (PSR ¶ 32); *See* Ex. E (Logan et al., 16 Trauma, Violence, & Abuse at 121) ("In essence, coercive control erodes an individual's capacity for independent decision making or personal agency. . . .  Stark (2007) argues that the net effect of coercive control on a victim is global: Victims suffer from cumulative harms rather than just suffering from injuries resulting from specific and definable incidents.").

Yihou's behavior was also deeply rooted in Chinese culture where hierarchical lines are sharply defined, and obedience and loyalty are highly valued.  *See, e.g.*, Ex. G (Aris Teon, *Directness, Hierarchy and Social Roles in Chinese Culture*, The Greater China Journal (March 9, 2017)) ("One may

imagine life in the Chinese-speaking world as an endless job interview, where almost every relationship is governed by strict rules and determined by hierarchical barriers."); Ex. H (Hannah Seligson, *For American Workers in China, a Culture Clash*, N.Y. Times (Dec. 23, 2009)) ("The Chinese now rising in the work force were raised and educated in a system that tended to prize obedience and rote learning.").  Yihou felt that as long as she made Seligman happy, she could have a prosperous future.  ECF No. 28, PageID.156 (PSR ¶ 32).  REDACTED

REDACTED *Id*.

REDACTED

REDACTED  ECF No. 28, PageID.160–161 (PSR ¶ 68).  REDACTED

REDACTED

REDACTED  Ex. B (Y. Han Ltr.).  Her close friends were in China REDACTED

REDACTED  *See* ECF No. 28, PageID.160–161 (PSR ¶¶ 67–68).

### 4.      Sterling Bank Terminates Yihou's Employment in 2019.

On November 1, 2019, Yihou's professional life came crashing down when Sterling Bank terminated her employment.  ECF No. 28, PageID.156 (PSR ¶ 34).  One week prior to her termination, Sterling Bank had asked Yihou and her team to fly to Michigan to meet with its legal counsel.  Ex. B (Y. Han Ltr.).  Montemayor had assured Yihou that she had nothing to worry about, explaining this meeting

was required by the Department of Treasury's Office of the Comptroller of the Currency ("OCC").  *Id.*  Seligman, in turn, had left Yihou a voicemail reassuring her that she was not in trouble.  *Id.*

Yihou visited Mr. Seligman's apartment for the final time in June 2020— approximately seven months after she was terminated by Sterling Bank, and more than ten years after she met him for the first time at the Portola Branch.  *Id.*

**B.     The Post-Offense Conduct: Yihou Immediately Accepts Responsibility for Her Conduct.**

Yihou's acceptance of responsibly has been remarkable.  On May 19, 2021, the earliest opportunity provided by the Department of Justice, Yihou pled guilty to Conspiracy to Commit Bank Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349.

As part of her agreement to cooperate with the government's investigation, Yihou has participated in multiple interviews, and provided full and comprehensive information to the government.  Ex. B (Y. Han Ltr.).  On March 15, 2023, the Holding Company (Sterling Bancorp) pled guilty to securities fraud due, substantially in part, to Yihou's cooperation.  2:23-cr-20174 ECF No. 12, PageID.94–96 (Sterling Bancorp, Inc. Plea Agreement).  The Holding Company admitted that Seligman and certain senior leaders at Sterling Bank encouraged loan officers to increase the volume of ALP loan originations to increase Sterling Bank's revenue through origination fees and interest payments—

thereby making the Holding Company look more attractive to investors in advance of its IPO in 2017.  *Id*. at PageID.102–103.  As part of the plea agreement, the Holding Company agreed to serve a term of probation through 2026, submit to enhanced compliance reporting requirements, and pay more than $27.2 million in restitution to its non-insider victim-shareholders.  *Id*. at PageID.71, 83–87.

On April 18, 2024, the OCC announced an enforcement action against Seligman and simultaneously published an order of prohibition and civil monetary penalty against him dated March 25, 2024.  Ex. I (Seligman Order).  The OCC found that from 2011 to December 2019, he "participated in the operation of the ALP," "contributed to a poor compliance culture at the Bank," and "pressured Bank employees to quickly underwrite ALP loans," which "contributed to the fraud within the ALP."  *Id.* at 2–3.  Seligman did not admit or deny the OCC's findings, but he consented to the OCC's resulting Order of Prohibition and Order for Civil Money Penalty of $400,000.  *Id.* at 5.

The OCC also recently announced enforcement actions and orders against other former Sterling Bank senior management, including former Chairman and CEO Gary Judd (Ex. J); former President, COO, and CFO Thomas Lopp (Ex. K); former President of Retail and Commercial Banking Michael Montemayor (Ex. L); former Senior VP and Managing Director of Residential Lending Stephen Adams

(Ex. M); former General Counsel Colleen Kimmel (Ex. N); and former Residential Underwriting Manager Jonathan Kolk (Ex. O).

The consent orders against Judd and Lopp indicate that each "failed to appropriately intervene . . . when an individual who was a consultant to the Bank, an advisory director to the Bank's Board, and who owned, directly or indirectly, a large number of shares of and was a vice president of the Bank's holding company, directly contacted and issued directives to Bank employees and otherwise participated in Bank operations," factual findings that clearly refer to Seligman. Ex. J, Art. II ¶ 3; Ex. K, Art. II ¶ 4.  Additionally, the OCC's consent order against Montemayor indicates that Montemayor "permitted significant pressure to be put on Sterling Bank employees to quickly underwrite loans," (Ex. L, Art. II ¶ 4), apparently referring to the significant pressure that the OCC found Seligman had exerted on Bank employees (*id.* ¶ 3).

Yihou has also fulfilled all aspects of her cooperation plea agreement.  Yet, notwithstanding her extensive cooperation, the Department of Justice announced in a letter to Seligman dated May 20, 2024, that it had closed its investigation of the Advantage Loan Program without any further charges.  5:22-cv-12398 ECF No. 59-2, PageID.1679.

### C.   The Devastating Post-Offense Consequences.

Even before the Court sentences Yihou, she has had to suffer through the life-changing consequences of her actions.  As part of her plea agreement, she agreed to a forfeiture money judgment in the amount of $3,381,355.26.  ECF No. 28, PageID.149–151 (PSR ¶ 4).  Upon losing her job in November 2019, she was out of work until June 2021.  ECF No. 28, PageID.162 (PSR ¶ 81).  She has since provided for her family by working as a waitress, through income derived from her rental property (Airbnb), and her savings.  ECF No. 28, PageID.162 (PSR ¶¶ 82–83).

On October 4, 2022, Yihou entered a consent order with the OCC that prohibits her from working in the banking industry.  Ex. P (Han OCC Order).  Under the OCC Consent Order, Ms. Han agreed not to:

> Participate in any manner in the conduct of the affairs of any insured depository institution, any institution treated as an insured bank, any insured credit union, any institution chartered under the Farm Credit Act, any appropriate Federal depository institution regulatory agency, and the Federal Housing Finance Agency and any Federal Home Loan Bank . . . .

Given that Yihou is prohibited from further working in the banking industry, she will never work as a loan officer again and make a salary close to what she made in that professional role.  Yihou currently has a negative cash flow and is surviving on savings.  ECF No. 28, PageID.163–165 (PSR ¶ 88).

Emotionally, the impact has been just as crushing.  Her indictment was the subject of headlines.[8]  She has had to endure public humiliation in her professional and social communities and know that her family has to suffer the same.  She has had to deal with the stress of trying to keep her family's finances afloat and figure out how she will pay the huge debt that she owes as a result of her offense conduct.

████████████████ REDACTED ████████████████

████████████  She has had to deal with the shame in the eyes of her parents.  And she has had to watch her parents bear this emotional and financial turmoil knowing that she created it.  Ex. B (Y. Han Ltr.).

## IV.    THE SENTENCING GUIDELINES CALCULATION

While the Sentencing Guidelines are the starting point in the sentencing process, they are neither binding nor presumed reasonable.  *Nelson v. United States*, 555 U.S. 350 (2009); *Rita v. United States*, 551 U.S. 338 (2007).  The Guidelines are only one factor for the Court to consider, to be given no more

---

[8] *See, e.g.*, *Banker pleads guilty in scheme that implicates S.F. Giants owner* (The Detroit News, May 19, 2021) (available at https://www.detroitnews.com/story/news/local/detroit-city/2021/05/19/banker-pleads-guilty-scheme-implicates-san-francisco-giants-owner/5162377001/); *Fraud Friday—Bank Executive Pleads Guilty to Scheme That Implicates Giants Baseball Team Owner* (Coleman Report, May 28, 2021) (available at https://colemanreport.com/coleman-movers-shakers-warren-baas-michael-donato-and-lindsey-hagerty-2/).

weight than any other.  *Gall v. United States*, 552 U.S. 38, 50 (2007) (upholding

probationary sentence on Guidelines range of 30–37 months).

The plea agreement provides for the following Guidelines calculation:

| Guideline Provision | Level |
|---|---|
| Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | +7 |
| Specific offense characteristics under U.S.S.G. Ch. 2: Gain Greater than $1,500,000, U.S.S.G. § 2B1.1(b)(1)(I) | +16 |
| Specific offense characteristics under U.S.S.G. Ch. 2: Offense involved sophisticated means, U.S.S.G. § 2B1.1(b)(10)(C) | +2 |
| Role in the offense adjustments under U.S.S.G. Ch. 3: Organizer, leader, manager or supervisor, U.S.S.G. § 3B1.1(b) or (c)[9] | +2/3 |
| Acceptance of Responsibility, U.S.S.G. § 3E1.1(a) | -2 |
| Acceptance of Responsibility, U.S.S.G. § 3E1.1(b)[10] | -1 |
| **Adjusted Offense Level** | **24/25** |

Because Yihou was an organizer, leader, manager, or supervisor in any

criminal activity other than as described in 3B1.1(a) or (b), the Probation Office

believes that a two-level upward adjustment under subsection (c) is most

appropriate.  ECF No. 28, PageID.165 (PSR ¶ 92).  With this two-level increase,

---

[9] The parties agree that the Aggravating Role provision under U.S.S.G. § 3B1.1 of up to 3 levels applies, but there is no agreement as to whether subsection (b) or (c) applies.

[10] Under the plea agreement, this is applicable only if Yihou's offense level is 16 or greater and she is awarded a two-level reduction under U.S.S.G. § 3E1.1(a).

Yihou's final offense level is 24.  With no criminal history, Yihou's Criminal

History Category is I and her Guideline sentencing range is 51–63 months, absent

a variance or departure.  The Probation Office agrees with this calculation.  *Id*.

## V.     <u>ARGUMENT</u>

"[T]he punishment should fit the offender and not merely the crime."

*Pepper v. United States*, 562 U.S. 476, 487–488 (2011) (internal quotation marks

omitted).  While the Court starts with the Guidelines, it must "make an

individualized assessment" of a just and proper sentence under the factors

presented in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 50; *Kimbrough v. United*

*States*, 522 U.S. 85, 91 (2007); *see United States v. Gupta*, 904 F. Supp. 2d 349,

350 (S.D.N.Y. 2012) ("Imposing a sentence on a fellow human being is a

formidable responsibility.  It requires a court to consider, with great care and

sensitivity, a large complex of facts and factors.")  If the Guidelines calculation in

a given case results in an "inordinate emphasis" on "putatively measurable

quantities," like financial loss, a court should focus more on the statutory factors

set forth in 18 U.S.C. § 3553(a) to determine an appropriate sentence.  *United*

*States v. Adelson*, 441 F. Supp. 2d 506, 509–12 (S.D.N.Y. 2006), *aff'd*, 301 F.

App'x. 93 (2d Cir. 2008).  Indeed, the Court "may vary [from Guideline ranges]

based solely on policy considerations, including disagreements with the

Guidelines."  *Kimbrough*, 522 U.S. at 101 (internal quotation marks omitted).

Here, a careful analysis of Yihou's role in the offense, her personal history and characteristics, her substantial cooperation with authorities, her acceptance of responsibility, and her sincere efforts to mitigate the harm resulting from her actions show there are substantial grounds for both departure from the guideline calculations and variance from the calculated sentence. We respectfully submit that, considered together, these factors support a sentence of 36 months of probation with six months of home detention.

### A.      Yihou's Substantial Assistance Merits a 5K1.1 Downward Departure.

Yihou provided substantial assistance to the investigation and prosecution of the Holding Company, and to agency enforcement actions against other individuals involved in the instant offense. Yihou's cooperation with authorities was exceptional when measured by the considerations set forth in Section 5K1.1 of the Sentencing Guidelines:

- Yihou's information and testimony was truthful, complete, and reliable. § 5K1.1(a)(2).

- The nature and extent of Yihou's cooperation was substantial. Yihou met with the government several times to provide information and testimony, cooperated against former friends and colleagues at great personal cost, repeatedly continued her own sentencing and resolution in the case for over three years in order to continue providing

substantial cooperation, and complied with any and all requests posed by the government.  § 5K1.1(a)(3).

- Yihou's cooperation was timely.  She cooperated from the outset of the investigation, and pled guilty at the earliest possible opportunity. Yihou's timely cooperation saved the government significant resources in its investigation, both in connection with her own case and related cases.  § 5K1.1(a)(5).

In recognition of this cooperation, the government has agreed to file a motion under Section 5K1.1 recommending a 14-level downward departure, taking Yihou's offense level from 24 to 10.  An offense level of 10, combined with Yihou's criminal history category of I, yields an advisory Guidelines range of six to 12 months' imprisonment.  Because Yihou's Guidelines range of six to 12 months' imprisonment falls within "Zone B" of the Sentencing Table, the Guidelines allow the Court to substitute home detention for the imprisonment mandated by the sentencing table, provided that the alternative punishment is for a length of time within the applicable guideline range and is imposed as a condition of probation.  U.S.S.G. § 5C1.1(c)(3) (permitting a sentence of probation, subject to certain conditions inapplicable here, if a defendant's applicable advisory guidelines range is within "Zone B"); *id*. § 5F1.2 ("Home detention may be

imposed as a condition of probation or supervised release, but only as a substitute

for imprisonment.").

### B.   The Section 3553(a) Factors Support a Non-Custodial Sentence.

Full consideration of the factors set forth in 18 U.S.C. § 3553(a) shows that a

non-custodial sentence is a fair and just sentence that is sufficient, but not greater

than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

### 1.   Yihou Is a First-Time Offender Who Has Fully Accepted Responsibility.

Yihou is a first-time offender who has accepted her responsibility for the

offense, including by agreeing to forfeit all assets obtained as a result of her crime.

Yihou's past and her character—as reflected in her personal history and the letters

submitted in her support—demonstrate that her conduct at Sterling Bank was a

deviation from an upstanding life otherwise spent in hard work and service.  *See* 18

U.S.C. § 3553(a)(1).

Until the instant offense, Yihou led a fully law-abiding, peaceful, and ethical

life.  As the letters submitted in her support by family, friends, and community

leaders show, Yihou is a devoted daughter and mother, a diligent worker, a

devoted friend, and an engaged and caring member of her community.  *See, e.g.*,

Ex. A, Tab 1 (Y. Chan Ltr.), Tab 2 (L. Chao Ltr.), Tab 3 (I. Choi Ltr.), Tab 4 (T.

Fang Ltr.), Tab 5, (F. Fung Ltr.), Tab 11 (S. Liu Ltr.), and Tab 12 (F. Ma Ltr.).

She failed to adhere to the values and standards she had always stood for in this

offense.  However, Yihou's true character led her to immediately accept

responsibility and attempt to mitigate her harms.

Her hard work and her generous spirit were developed over years of

overcoming her own setbacks and challenges.  The Han family left everything

behind in China to start a new life in the United States, and Yihou struggled to

support herself and her parents.  Ex. A, Tab 1 (Y. Chan Ltr.), Tab 6 (J. Han Ltr.),

Tab 17 (L. Tian Ltr.).  According to Yihou's father, "When we first arrived in

America, we had nothing and faced extreme difficulties. . . .  At the time, [Yihou]

was only 21 years old.  She helped me find a job, acted as my guide, and translated

for me."  Ex. A, Tab 6 (J. Han Ltr.).  Yihou sought to ease her parents' despair and

reassured her mother that she would "work hard to make money."  Ex. A, Tab 17

(L. Tian Ltr.).

Even when Yihou experienced setbacks in her career as a travel agent, flight

attendant, or loan officer, she persevered and became a valued member of her

community.  Ex. A, Tab 13 (G. Paik Ltr.).  The letters written on Yihou's behalf

recount concrete examples of acts she took to assist others.  She has helped

newcomers to this country coordinate medical care and chemotherapy treatment

(*id*., Tab 16 (L. Tang Ltr.)); she has driven friends to doctor's appointments when

they were unable to (*id*., Tab 12 (F. Ma Ltr.)); she has opened her home to friends

needing temporary housing (*id*., Tab (K. Lam Ltr.)); she has actively advocated on

behalf of the Asian American community (*id.*, Tab 9 (K. Lam Ltr.)); she has raised awareness of at-risk populations for Hep-B (*id.* Tab 5 (T. Fang Ltr.), Tab 8 (B. Kemler Ltr.)); and she has done so without asking for anything in return.

Yihou asks the Court to consider the words of those who know her when weighing the importance of § 3553(a)(1) in this case, including on the following points:

- Yihou poses no danger to the public.  She has no criminal history, has a perfect pretrial services compliance record, and is described by the people who know her repeatedly as a hardworking, trustworthy, and compassionate person.

- Yihou is devoted to her family and plays an integral and irreplaceable role in their lives, especially her infant daughter.

- Yihou has lived her life with purpose to help her parents and extended family, and give back to the community in a meaningful way.  She is the person her friends turn to when they need support.

- Yihou demonstrates this kindness and selflessness despite significant personal trauma that occurred before and during the time period of the offense.

Courts in other cases have exercised their discretion to impose non-Guidelines sentences based on the personal characteristics of the defendant.  *See,*

*e.g.*, *Gupta*, 904 F. Supp. 2d at 353 (premising downward variance, in part, on defendant's "big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came in contact"); *Adelson*, 441 F. Supp. 2d at 513 (premising downward variance, in part, on letters from "persons from all walks of life . . . attesting, from personal knowledge, to [defendant's] good works and deep humanity," his "generosity of spirit," and his "integrity and generosity") (internal quotation marks omitted).  Similar considerations are present here.

### 2. The Nature and Circumstances of the Offense Strongly Support Leniency.

Yihou does not dispute that she carried out the offense conduct as described in the plea agreement.  It is important to recognize, however, that Yihou carried out the offense at the direction of Sterling Bank's most senior leaders, including Seligman.  Seligman recruited Yihou to help with the ALP because she was young, had no training in the lending and banking industry, and she was the only lending officer for a time who spoke Chinese at Sterling Bank, and the program targeted the Chinese community.  ECF No. 28, PageID.154 (PSR ¶ 23).  Seligman encouraged Yihou to increase ALP loan originations in order to increase Sterling Bank's revenue in advance of the Holding Company's IPO.  ECF No. 11, PageID.58 (Plea Agreement).  This does not make Yihou innocent, nor is this a defense.  She knows now what she did was wrong.  Nevertheless, to accurately contextualize the nature and circumstances of the offense, the Court should take

into consideration the involvement of other participants in the offense, including senior leaders at Sterling Bank.

The Court should also take into consideration the absence of demonstrated losses stemming from fraud in the ALP. *See United States v. Rossi*, 422 F. App'x 425, 436 (6th Cir. 2011) (explaining that "the loss amount informs the district court's analysis of the 'nature and circumstances of the offense,' § 3553(a)(1), and the 'seriousness of the offense'"). As the PSR alludes to, the ALP appears not to have led to losses for Sterling Bank beyond what would have been expected for a portfolio of residential borrowers. ECF No. 28, PageID.153 (PSR ¶ 17). To be sure, there would have been no gains without Yihou's offense conduct, and she bears responsibility for the offense. Still, the amount of gain accounts for over sixty percent of Yihou's Adjusted Offense Level, and the sixteen-level increase for the amount of gain moves the Guidelines from Zone A to Zone D. Yihou urges the Court to focus on the § 3553(a) factors that allow the Court to engage in the "uniform and constant" exercise "in the federal judicial tradition" of "consider[ing] every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United* States, 518 U.S. 81, 113 (1996).

### 3.    A Custodial Sentence Is Not Necessary to Achieve Just Punishment and Respect for the Law.

Yihou participated in a serious offense that merits punishment.  However, any term of incarceration would be "greater than necessary" to promote respect for the law and to provide just punishment for Yihou's offense.

As described above, Yihou has already faced just punishment in her personal, professional, and financial capacity.  Due to her actions, Yihou lost the career she built and her livelihood.  Moreover, she lost her reputation, which meant a great deal to her and her family.  The damage to Yihou's reputation was certainly justified, but it was also a substantial loss.  Yihou and her family have also suffered tremendously in the last three years as they awaited sentencing.  With their futures uncertain, Yihou and her family have kept awake at night with sorrow and regret.

Sentencing courts routinely consider the kind of substantial personal, professional, and financial consequences Yihou has faced in imposing below-guidelines sentences.  *See, e.g.*, *United States v. Britt*, 27 F. App'x 862, 865 (9th Cir. 2001) (affirming below guideline sentence in part based on collateral consequences of conviction, including permanent damage to defendant's career and the loss of "an opportunity to start a new life and career"); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1316 (D.N.M. 2007) *aff'd*, 523 F.3d 1258 (10th Cir. 2008) (imposing below-guideline sentence in part because "it is highly unlikely that [the defendant] will be able to attain another position that will allow him to

commit a similar crime."); *United States v. Redemann*, 295 F.Supp.2d 887, 897

(E.D. Wis. 2003) (below guideline sentence appropriate where defendant was

subject to a substantial monetary penalty and suffered substantial adverse publicity

and personal, business, and family consequences that would deter future

misconduct).

Yihou has already faced just punishment in her personal, professional, and

financial capacity.  Further punishment in the form of a custodial sentence is not

warranted.   Sending Yihou to prison is simply not necessary—indeed it would be

greater than necessary—to promote respect for the law.  *See, e.g.*, *United States v.*

*Walker*, 918 F.3d 1134, 1150 (10th Cir. 2019) (holding that "home confinement

certainly increased the severity of [defendant's] punishment" and that "home

confinement itself functions as an alternative to a period of incarceration in

prison"); *United States v. Coughlin*, No. CRIM. 06-20005, 2008 WL 313099, at *5

(W.D. Ark. Feb. 1, 2008) ("Home detention and probation can be severe

punishments, hugely restrictive of liberty, highly effective in the determent of

crime and amply retributive.").

### 4.    Incarceration Is Not Necessary to Protect the Public Or for Specific Deterrence.

Incarceration is not necessary to either protect the public from Yihou or to deter her from committing future offenses.[11]  Yihou's age and status as a first-time offender make her less likely to recidivate, less of a threat to the community, and make each year of incarceration that much more devastating and unnecessary as a form of punishment.[12]

There is no reason to believe Yihou would commit another fraud—or that she will ever be in a position to do so.  She has been out of custody, with a perfect pretrial services record, for more than three years.  She will never work again in the banking industry, having agreed to a lifetime bar on doing so in resolving the action filed against her by the OCC (in addition to a lifetime bar from engaging in any business relationship with an entity regulated by the Federal Housing Finance Agency).  Ex. P (Han OCC Order); Ex. R (FHFA Final Suspension Order).

---

[11] Social science research makes clear that "across all offenders, prisons do not have a specific deterrent effect." Ex. Q (Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S, 60S (2011)).

[12] *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, United States Sentencing Commission, May 2004 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf).

More to the point, Yihou recognizes that what she did was wrong, is genuinely remorseful, and, regardless of what this Court does, she has and will suffer significant consequences for her crime.  On top of all of that, Yihou will now live with a felony conviction.  Independent of any sentence the Court imposes, a felony record brings with it such "broad ranging" collateral consequences— including on a defendant's "economic, political, and social rights"—that some courts have referred to it as a "modern civil death."  *United States v. Nesbeth*, 188 F.Supp.3d 179, 182 (E.D.N.Y. 2016).

Adding to this a period of incarceration is not necessary to achieving the government's interest in specific deterrence.  Given the severe collateral consequences that this conviction has cost her, Yihou is more than amply deterred from ever engaging in such conduct again.

### 5.    Incarceration Is Not Necessary for General Deterrence.

Nor does incarceration of Yihou serve the goal of general deterrence of crime.  The consequences of Yihou's conduct, as discussed above, have been severe.  In combination with a non-custodial sentence, these serious consequences adequately serve the interests of general deterrence.  *See, e.g.*, *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (affirming non-incarcerative sentence where incarceration would only serve the interests of general deterrence, and "[s]ociety's interest in incarceration as opposed to atonement does not weigh

heavily."); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income . . . constitutes a source of both individual and general deterrence.").

While some courts take the view that some period of incarceration serves the goal of general deterrence, "there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514; *see* Richard Frase, *Punishment Purpose*s, 58 Stanford L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty."); Ex. S (Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill. Univ. L. J. 485, 493 (1999)) (finding empirical research on general deterrence "inconsistent").

More significantly, any public interest served by a prison sentence to promote general deterrence is substantially outweighed in this case by the need to incentivize early and substantial cooperation with authorities. Yihou's cooperation, acceptance of responsibility, and public remorse should be acknowledged when evaluating the appropriate sentence. Further,

Section 3553(a)(2)(B) "does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (not unreasonable for district court to reject idea that prison sentence for defendant convicted of bank and bankruptcy fraud would promote general deterrence; defendant sentenced to five years' probation, with seven months home confinement on Guidelines of 27–33 months) (footnote omitted). Even the Department of Justice recognizes that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime."[13]  A sentence of probation with home detention is also sufficient to achieve the purpose of affording adequate general deterrence to similar criminal conduct.

### 6. The Proposed Sentence Is Commensurate with Yihou's Role Relative to Others' Participation in the Offense and Will Lessen the Significant Sentencing Disparity.

The government's decision to prosecute Yihou stands in stark contrast to the treatment of other senior executives at Sterling Bank whom the government declined to prosecute.  It is appropriate for the Court to consider Yihou's sentence in light of the punishment that others who also played culpable roles in the offense conduct will—or will not—suffer.  *See* 18 U.S.C. § 3553(a)(6) (directing sentencing courts to consider the need to avoid unwarranted sentencing

---

[13] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence* (available at http://nij.gov/five-things/pages/deterrence.aspx#addenda).

disparities); Frase, *Punishment Purposes*, 58 Stanford L. Rev. at 80 ("When offenders appear to have been unfairly singled out, respect for the law and law enforcement suffers.").

In addition to Yihou and the Holding Company, the government prosecuted two other Sterling Bank employees in connection with the ALP scheme: Hao Liang Hu ("Frank") and Amy Lu ("Amy"), both of whom were recently sentenced by the District Court, Central District of California.[14]  ECF No. 28, PageID.147 (PSR).  Frank was sentenced to six months of home detention, and Amy was sentenced to time served, three years of supervised release. *Id.*  Like Yihou, both of these defendants pled guilty to one count of conspiracy to commit bank fraud and wire fraud.

Yet, Yihou, Frank, and Amy did not act alone.  Other former senior management at Sterling Bank were instrumental in the ALP scheme but are beyond the reach of justice and will suffer no adverse consequences.  We make this point not to deflect blame.  As set out in the plea agreement, in the PSR, and in her letter to the Court, Yihou fully accepts responsibility for her offense, even to the point of agreeing to a two-point enhancement for her role.  Even so, in determining a fair and just sentence, the Court should consider both the roles that others played in the

---

[14] *United States v. Amy Lu*, 21-CR-00084, and *United States v. Hao Liang Hu*, 21-CR-00097 (CD Cal.) (collectively, the "Related Cases").

relevant conduct and the fact that they will completely avoid responsibility despite their significant roles in the offense.

### 7. The Proposed Sentence Is Consistent with Sentences Given to Defendants in Other Fraud Cases.

The "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" also counsels in favor of a below-Guidelines sentence. 18 U.S.C. § 3553(a)(6).

The 2023 Sourcebook contains the most recent federal sentencing statistics for sentences imposed between October 1, 2022 and September 30, 2023 (i.e., Fiscal Year 2023 "FY 2023"). The 2023 Sourcebook shows that in FY 2023, only 42.4% of all sentences nationally were within the Guidelines range. Ex. T (2023 Sourcebook, Table 30). More specifically, only 32.4% of all sentences handed down in the Eastern District of Michigan were within the Guidelines range. *Id.*; Ex. U (Statistical Information Packet, Table 8). Thus, a sentence *below* the Guidelines range is the overriding *norm*, and *not* the exception in this district.

Table 7 of the Statistical Information Packet, entitled "Sentence Length By Type of Crime," provides the mean and median sentence for each offense category in FY 2023. Conspiracy offenses are not delineated separately. But for fraud/theft/embezzlement sentences, mean sentences were 22 months (nationally) and 20 months (E.D. Mich.); and median sentences were 12 months (nationally) and 12 months (E.D. Mich.). Ex. U (Statistical Information Packet, Table 7)*.*

In this district, the majority of defendants convicted of crimes for which the main Guideline is Section 2B1.1 have received below-Guidelines sentences.  Ex. V-1 and V-2 (Sentencing Commission Data Capture).  From 2015 through 2023, in this district, the median sentence for a defendant convicted of fraud, with no criminal history, and in Zone D of the guidelines, received a sentence that included a term of incarceration of 24 months.  Ex. W (Sentencing Commission Data Capture).  The national statistics are similar.  Ex. X (Sentencing Commission Data Capture).[15]

Even if the Court determines—over the government and Yihou's objection—that a sentence of 36 months of probation with six months of home detention is not appropriate, the Court would be in good and abundant company in varying downward from the Guidelines range.  These collective statistics demonstrate that across the country, and especially within the Sixth Circuit and the Eastern District of Michigan, the Guidelines no longer constitute the predominant factor in setting the majority of sentences.  In the interests of justice then, this Court should sentence Yihou to a below-Guidelines sentence that is substantially

---

[15] Fraud/theft/embezzlement sentences, mean sentences were 22 months (nationally) and 20 months (E.D. Mich.); and median sentences were 12 months (nationally) and 12 months (E.D. Mich.).  Ex. U (*Statistical Information Packet*, Table 7).

below the Guidelines range to bring her sentence in line with similarly situated

defendants.  *See* 18 U.S.C. § 3553(a)(6).

### C.   Forfeiture, Fine, and Restitution.

The plea agreement provides that the government will not recommend a fine

or restitution.  PageID.71 (Plea Agreement).  Given Yihou's income, earning

capacity, and financial resources, and the burden that any fine would impose upon

her and her family, no fine should be imposed.  *See* 18 U.S.C. § 3572(a)(1), (2).

Under the plea agreement, Yihou was required "to forfeit all property

constituting, or derived from, proceeds she obtained, directly or indirectly, as the

result of her violation of 18 U.S.C. § 1349 including, but not limited to, a forfeiture

money judgment in the amount of $3,381,355.26."  PageID.71–72 (Plea

Agreement, ¶ 9(F)).  We respectfully submit that the forfeiture provision is unfair

to Yihou, and the Court should modify the forfeiture amount to avoid sentencing

disparities and in the interest of justice.  *United States v. Dean*, 80 F.3d 1535, 1541

(11th Cir. 1996), opinion modified on reconsideration, 87 F.3d 1212 (11th

Cir. 1996) ("a district judge is permitted to modify forfeiture provisions of a [] plea

agreement when the court determines that the agreed upon forfeiture is unfair to

the defendant.").

First, the defendants in the Related Cases—Amy and Frank—also agreed to

forfeiture in their plea agreements, but neither defendant received an order of

forfeiture.  Instead, Amy received a $250,000 fine and Frank received a $100,000

fine.  Thus, an order of forfeiture of more than $3.3 million against Yihou would

be vastly disproportionate to the fines ordered in the Related Cases.  Indeed, Frank

agreed for Sentencing Guidelines purposes that $2,519,488.98 in earned

commission was the gain resulting from his offense, which is comparable to

Yihou's reported gain amount of $3,381,355.26.

Second, as the PSR alludes to, the ALP appears not to have led to losses for

Sterling Bank beyond what would have been expected for a portfolio of residential

borrowers.  In fact, the government admits that Sterling Bank largely profited from

Yihou's offense conduct.  Further, Yihou is a mother with an infant child, and

she's relatively unemployed right now and can no longer work in the banking

industry.  As set forth above, Yihou's career and earning potential have been

decimated and her remaining savings have been (and continue to be) depleted as a

result of her unemployment.  Any order of forfeiture will impose a substantial

burden not only on Yihou, but also her parents and child, who depend on her for

financial support.

Lastly, justice also requires that the Court modify any forfeiture amount by

any state and federal taxes that Yihou already paid on her reported gain amount

of $3,381,355.26 .  The government likewise recommends that any monetary

component of Yihou's sentence be reduced by any state and federal taxes already paid.

## VI.   **CONCLUSION**

For all of the foregoing reasons, we respectfully request that the Court sentence Yihou to 36 months of probation with a special condition requiring six months of home detention as substitute imprisonment; and a monetary component, comparable to the fines received by the defendants in the Related Cases.


DATED: August 13, 2024          COBLENTZ PATCH DUFFY & BASS LLP


                                        */s/Marcia Valadez Valente*
                                        Marcia Valadez Valente
                                        Attorneys for Defendant
                                        YIHOU HAN